502 F.2d 1238
 7 ERC 1025, 4 Envtl. L. Rep. 20,793
 STATE OF ALABAMA and Alabama Air Pollution Control
Commission ex rel. William J. Baxley, Attorney
General, Plaintiffs-Appellants,
v.
Lynn SEEBER, General Manager of Tennessee Valley Authority,
et al., Defendants-Appellees.
 No. 73-2766.
 United States Court of Appeals, Fifth Circuit.
 Oct. 14, 1974.
 
 William J. Baxley, Atty. Gen., Myron H. Thompson, Asst. Atty. Gen., Henry H. Caddell, Asst. Atty., Gen., Chief, Environmental Protection Div., Montgomery, Ala., for plaintiffs-appellants.
 Philip K. Maxwell, Asst. Atty. Gen., Austin, Tex., amicus curiae for State of Texas.
 David C. short, David D. Beals, Asst. Attys. Gen., Frankfort, Ky., amicus curiae for Com. of Kentucky.
 Jan E. Chatten, Deputy Atty. Gen., Los Angeles, Cal., amicus curiae for State of California.
 Wyman G. Sherrer, U.S. Atty., Charles Stewart, Wm. D. Mallard, Asst. U.S. Attys., Birmingham, Ala., Kent Frizzell, Asst. Atty. Gen., Martin Green, Chief, Pollution Control Sec., James R. Walpole, Atty., Land and Natural Resources Div., Dept. of Justice, Washington, D.C., Robert H. Marquis, Gen. Counsel Herbert S. Sanger, Jr., Associate Gen. Counsel, Beauchamp E. Brogan, Asst. Gen. Counsel, Justin M. Schwamm, Atty., Tenn. Val. Authority, Knoxville, Tenn., Wallace H. Johnson, Jacques B. Gelin, Larry G. Gutterridge, Attys., Dept. of Justice, Washington, D.C., for defendants-appellees.
 Before GODBOLD, SIMPSON and INGRAHAM, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Plaintiffs appeal from a summary judgment denying declaratory and injunctive relief and holding that 42 U.S.C. 1857f, 118 of the Clean Air Act Amendments of 1970 (the Act), does not require defendants to comply with a state requirement, previously approved by the Environmental Protection Agency, that a written permit be obtained for the operation of equipment causing air pollution. Plaintiffs are the State of Alabama and the Alabama Air Pollution Control Commission (the Commission). Defendants are the Tennessee Valley Authority and various TVA officials (hereinafter 'TVA'), and various officers and agencies of the United States Army (hereinafter 'the Army').[1]
 
 
 2
 Rule 1.12 of the Commission, provisions of which are set out in the margin,[2] requires obtaining from that body a written permit for the operation of any equipment the use of which may cause an increase in air pollution. This rule is a part of the implementation plan for the control of air pollution formulated by Alabama and approved by the Administrator of EPA in accordance with 110 of the Act (42 U.S.C. 1857c-5). See 37 Fed.Reg. 10847-10848 (1972). Defendants have supplied information concerning their emissions of air pollutants to the Commission and have taken steps to abate those emissions, but they refuse to apply for permits in the belief that the Act does not subject them to the Rule 1.12 permit requirement. We must interpret the Act, and particularly 118, in order to determine whether that refusal is justified.[3] We conclude that it is not. In doing so we reach a result contrary to decisions of the Sixth Circuit, Kentucky v. Ruckelshaus, 497 F.2d 1172 (CA6, 1974), and the District Court for the Central District of California, California v. Stastny, 382 F.Supp. 222 (C.D.Cal.1972), appeal docketed, No. 72-2905, CA9, Nov. 6, 1972. The Stastny decision states a conclusion without explication of the supporting analysis. Our reasons for reaching a conclusion different from the Sixth Circuit appear below.
 
 I. Interpretation of 118
 
 3
 Section 118 of the Act (42 U.S.C. 1857f) provides:
 
 
 4
 Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements. The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so, except that no exemption may be granted from section 1857c-- 6 of this title, and an exemption from section 1857c-- 7 of this title may be granted only in accordance with section 1857c-- 7(c) of this title. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption.
 
 
 5
 The phrase 'shall comply with . . . State . . . requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements' effectively conveys a Congressional intent that federal facilities are to be treated equally with private facilities in the scheme of control established by the Act. Recognizing that in particular instances such treatment might prove inconsistent with the national interest, the section provides for executive exemption from any requirement.
 
 
 6
 The scheme of the Act as a whole also supports the conclusion that federal facilities are subject to the Alabama permit requirement. With respect to existing stationary sources of air pollution the Act places the primary responsibility for setting and enforcing emission standards or limitations on the states. EPA, pursuant to 109 of the Act (42 U.S.C. 1857c-4) establishes primary and secondary ambient air quality standards, and the states, pursuant to 110 (42 U.S.C. 1857c-5) establish, subject to approval by EPA, implementation plans geared to meeting the air quality standards. Such implementation plans include, inter alia, 'emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance' of the air quality standards, provisions 'for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality,' and 'necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan.' 110(a)(2)(B), (C) & (F). The Alabama permit requirement is a part of the Alabama implementation plan previously approved in accordance with the provisions of 110. Indeed, as inspection of the rule itself indicates, it is not only a part of the implementation plan but appears to be the central mechanism by which the Alabama plan provides for the gathering of information and the enforcement of emission limitations necessary to achieve air quality standards.
 
 
 7
 Sections 111, 112, and 114 (42 U.S.C. 1857c-6, 1857c-7, and 1857c-9) of the Act explicity exempt certain federal facilities from state authority to enforce requirements established by EPA pursuant to those sections.[4] Those sections deal with specialized emission standards for new sources and hazardous pollutants and with recordkeeping, inspection and monitoring requirements established directly by EPA. In view of these explicit exemptions for federal facilities, particularly the exemptions in 111 and 112, which like 110 establish control schemes for certain classes of air pollution sources, the absence of any such exemption in 110 suggests that the provisions of implementation plans adopted and approved pursuant to that section, including provisions for state enforcement of emission limitations through permit systems, are applicable to federal facilities.
 
 
 8
 The general scheme that emerges from the Act as a whole appears to be that responsibility and authority for enforcement with respect to federal facilities are granted to the states for sources with respect to which state implementation plans establish the criteria for enforcement, and is granted to EPA in those instances (i.e., new sources and hazardous pollutants) where EPA establishes the criteria. The scheme is a reasonable one. Because of variations in air quality between states and regions the emissions criteria established under state plans may vary considerably, thus making enforcement by EPA against scattered federal facilities administratively difficult. The new source and hazardous pollutant criteria established by EPA, however, are not tied to air quality standards and may, therefore, vary little or not at all by area, making EPA enforcement against federal facilities more convenient.
 
 
 9
 The Congressional purpose in enacting 118 supports our reading of the Act. The legislative history indicates that Congressional displeasure with the performance of federal facilities under the then existing provisions of the Air Quality Act of 1967 prompted the enactment of 118. In hearings on the Clean Air Amendments of 1970, the Senate Public Works Committee found 'many incidents of flagrant violation of air and water pollution standards by Federal facilities;' S.Rep.No. 91-1196, 91st Cong., 2d Sess., at 23 (1970). Additionally the Committee noted,
 
 
 10
 Federal agencies have been notoriously laggard in abating pollution and in requesting appropriations to develop control measures . . ..
 
 
 11
 Id. at 37. See also, H.Rept. No. 91-1146, 91st Cong., 2d Sess., in 1970 U.S.Code Cong. & Admin.News at 5360. Section 111 of the prior Act relied primarily on voluntary compliance by federal facilities. In strengthening the Act by replacing that section with present 118 Congress sought to depart from the policy of voluntary compliance and make emission limitations enforceable against federal facilities. With respect to existing sources the Act places upon the states primary responsibility for establishing and enforcing emission limitations, and Alabama, like many other states, relies on a permit system as its method of enforcement as well as a method of generating information concerning emissions. To deny the applicability to federal facilities of that permit requirement would be tantamount to a return to the Congressionally-rejected policy of voluntary compliance by federal facilities.[5] Moreover a holding that 118 does not embrace permit systems would represent a retreat from the provisions of prior 111. That section allowed the Secretary of HEW to establish classes of pollution sources for which federal facilities could be required to obtain a permit from the Secretary. Since 118 does not distinguish between federal and state requirements, holding state permit systems outside the scope of 118 would imply the same conclusion with respect to any federal permit system. The result would be that the Administrator of EPA (who assumed responsibility for air pollution control activities when EPA was established) could not under the stronger 118 do what the Secretary of HEW was explicitly entitled to do under the prior 111.
 
 
 12
 Defendants seek to avoid the impact of 118 by engrafting upon it a substantive procedural overlay. They argue that the phrase 'requirements respecting control and abatement of air pollution' means only requirements such as emission standards and limitations, which they label 'substantive,' and does not include mechanisms, e.g., permit systems, for enforcing these requirements.[6] Having affixed these new labels, defendants would have us infer that while federal agencies must, and will, comply with the 'substantive,' it was not intended that they be bound by the 'procedural,' a term which in defendants' construct is sub-silentio pejorative, impliedly denigrating the Congressionally-mandated mechanisms of enforcement to a status of less dignity and import. This recharacterization of the statutory scheme is a semantical red herring. It draws no sustenance from the Act itself. No such limitation is apparent from the words of 118. Moreover the language of 116 (42 U.S.C. 1857d-1) is inconsistent with defendants' reading of 'requirements.' There Congress used words identical to the 118 'requirements' phrase.
 
 
 13
 Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . ..
 
 
 14
 The 'or' in 116 is clearly disjunctive. Therefore, contrary to the position of the defendants, 'requirements' must include more than emission standards or limitations. Finally if 118 did not extend to enforcement mechanisms, it would be difficult to understand why Congress explicitly afforded exemptions from state enforcement in 111 and 112. Both sections provide that if the Administrator finds a state-developed procedure for implementing and enforcing the emission standards and limitations developed by EPA under those sections adequate, 'he shall delegate to such State any authority he has under this chapter to implement and enforce such standards' except with respect to federal facilities. If 118 did not include enforcement mechanisms, there would be no need for these exemptions.
 
 
 15
 In Kentucky v. Ruckelshaus, supra, the Sixth Circuit picked up the defendants' substantive-procedural recharacterization and held that 118 is limited to 'substantive' requirements, a category from which it excluded permit systems. As we read its opinion, that court's conclusions rest on these factors: the ability of states to sue federal facilities under 304 (42 U.S.C. 1857h-2) of the Act; statements contained in the legislative history; and the lack of support in Executive Orders for the contention that 118 includes 'procedural' permit requirements. With deference, we find these factors unconvincing. The inference from 304 is discussed infra at Part III; the legislative history is discussed below in this section of our opinion; and Executive Order No. 11752 is discussed infra at Part IV.[7]
 
 
 16
 Defendants' principal attempt to justify their position, and one of the factors relied on by the Sixth Circuit in its decision, consists of what seems to us a strained reading of the Act's legislative history. They rely on the brief summary of 118 contained in the Conference Report, H.Rep.No. 91-1783, 91st Cong., 2d Sess., at 48 (1970), U.S.Code Cong. & Admin.New, p. 5381, which reads, 'The House bill and the Senate amendment declared that Federal departments and agencies should comply with applicable standards of air quality and emissions.' Taken in isolation this statement would seem to suggest that 'requirements' means emission limitations, but other factors lead us to assign it little weight. In response to the problem of inadequate compliance by federal facilities with air pollution control measures the House of Representatives passed H.R. 17255 requiring that federal facilities 'comply with applicable Federal, State, interstate, and local emission standards and with the purposes of this Act . . ..' The bill passed by the Senate, S. 4358, however, stated that federal facilities 'shall comply with the requirements of this Act in the same manner as any person must so comply . . ..' As reported by the Conference and as enacted in Public Law 91-604, the final provision requires that federal facilities 'comply with Federal, State, interstate and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements.' The change from 'emission standards' in H.R. 17255 to 'requirements' in the final version supports the more inclusive view of 118. Given the change in language from 'emission standards' in the House bill to 'requirements' in the final version, the apparent attempt to put federal facilities on the same footing as any other person, the lack of any apparent limitation in the language of 118 itself or any discussion of such a limitation anywhere in the legislative history, and the scheme of the Act as a whole, we be lieve that the Conference Report statement is more accurately read as a statement of the ultimate goal of the provision rather than as a road map of how to get there. No one disputes that the goal of 118 is to assure compliance by federal facilities with air quality and emission standards. The question is rather whether Congress intended that the enforcement mechanisms of federally approved state implementation plans, in this case permit systems, would be used as a method of achieving this goal. And with regard to this question the legislative history, except to the extent that it reveals the Congressional purpose discussed earlier, is ambiguous.[8] Confronted with this ambiguity, we rely on the words of 118, the scheme of the Act as a whole, and what we discern to be the Congressional purpose, as the best guides to interpreting the section.
 
 
 17
 Finally defendants suggest that allowing states to subject federal facilities to the procedural requirements contained in state implementation plans would be unduly burdensome. This argument is substantially undermined by the defendants' contention that even absent subjection to the permit requirement they are bound to, and will, comply with substantive emission limitations, compliance schedules, information gathering and monitoring requirements. Some burden may remain, but under the scheme enacted by Congress determination of whether that burden is undue, and relief if it is, is a matter for executive rather than judicial decision. Section 118 itself authorizes the President to exempt federal facilities from any state requirement 'if he determines it to be in the paramount interest of the United States to do so.'[9]
 
 II. The Supremacy Clause
 
 18
 The TVA defendants do not claim sovereign immunity from suit but do claim that TVA, as an 'agency and instrumentality of the federal government,' is exempted from state regulation by the Supremacy Clause, Art. VI, clause 2 of the United States Constitution. The Army similarly invokes the clause. On the strength of this argument, the Sixth Circuit recently held in Kentucky v. Ruckelshaus, supra, that Kentucky cannot compel TVA's compliance with a Kentucky air pollution control permit system. That holding was premised on the Sixth Circuit's conclusion that 118 was limited to 'substantive' requirements and thus did not authorize subjecting federal facilities to the Kentucky permit requirements. Absent the 118 authorization, the Supremacy Clause barred state enforcement of the requirement. Given the premise, we would not disagree with the conclusion. It is on the proper interpretation of 118 that we part company with the Sixth Circuit. For the reasons explicated in Part I supra, we believe that 118 does embrace the Alabama permit requirement. Having reached this conclusion, the Supremacy Clause is inapplicable because Congress has authorized subjecting federal facilities to the state regulation involved. 'It lies within Congressional power to authorize regulation . . . by the state of federal instrumentalities.' Mayo v. United States, 319 U.S. 441, 446, 63 S.Ct. 1137, 1140, 87 L.Ed. 1504, 1508 (1948). Section 118 adequately meets the requirement that Congress 'affirmatively declare its instrumentalities or property subject to (state) regulation . . ..' Id. at 448, 63 S.Ct. at 1141, 87 L.Ed. at 1509. Cf. Baltimore National Bank v. State Tax Commission, 297 U.S. 209, 56 S.Ct. 417, 80 L.Ed. 586 (1936). Moreover, it is at least arguable that the regulation involved here is as much federal regulation as state. The Alabama permit requirement was included in an implementation plan approved by EPA under 110 of the Act. The Act gives EPA power to enforce any implementation plan requirements, 113, and also provides for citizen suits in federal courts to enforce at least some such requirements, 304. Neither of these provisions is consistent with the view that the components of approved implementation plans are exclusively state regulations.
 
 III. Sovereign Immunity
 
 19
 Distinct from the Supremacy Clause issue, the Army defendants argue that as against them this action is barred by the sovereign immunity of the United States from suit. Our determination of the meaning of 118 also forecloses this contention. That section states that federal facilities 'shall comply' with state 'requirements respecting control and abatement of air pollution,' a phrase which we interpret to include the Alabama permit requirement. This statement occurs in the context of an Act which relies in the first instance on state enforcement of such requirements after their approval by EPA.[10] Little or no inference is required to conclude that 118 embodies a waiver of sovereign immunity with respect to federal facilities. A contrary result would render largely meaningless our conclusion as to the scope of 118 and herald a return to the policy of voluntary compliance which Congress sought to change by enacting that section.
 
 
 20
 The defendants contend in an argument accepted by the Sixth Circuit that 304 authorizes suits against the United States for violation of an 'emission standard or limitation,' as therein defined, or an order with respect thereto; that it does not authorize suits for failure to comply with permit requirements; and that, therefore, we should infer that Congress did not consent to suits against federal facilities regarding permit requirements. The argument is unconvincing. Even assuming that a state is technically a 'person' entitled to sue under 304, see Kentucky v. Ruckelshaus, supra, and that 304 does not authorize suits for violation of permit requirements, it does not follow that 118 does not authorize such suits. The 'Citizens Suits' heading of 304, the fact that 304(d) provides for awarding attorney fees, and the legislative history of the section[11] demonstrate that the congressional focus in enacting that provision was on suits by private parties. Consequently, we believe that 304 cannot be properly read as implying anything about the ability of states to sue under 118.
 
 IV. Executive Order No. 11752
 
 21
 Alabama initially sought to rely on language contained in Executive Order No. 11507, 35 Fed.Reg. 2573 (1970), note following 42 U.S.C.A. 4331 (1973), as an alternative basis for requiring federal facilities to comply with the state permit requirement. That Order has since been superseded by Executive Order No. 11752, 38 Fed.Reg. 34793 (1973), note following 42 U.S.C.A. 4331 (Supp.1974), which includes the following statement:
 
 
 22
 Section 1. Policy. It is the purpose of this order to assure that the Federal Government, in the design, construction, management, operation, and maintenance of its facilities, shall provide leadership in the nationwide effort to protect and enhance the quality of our air, water, and land resources through compliance with applicable standards for the prevention, control, and abatement of environmental pollution in full cooperation with State and local governments. Compliance by Federal facilities with Federal, State, interstate, and local substantive standards and substantive limitations, to the same extent that any person is subject to such standards and limitations, will accomplish the objective of providing Federal leadership and cooperation in the prevention of environmental pollution. In light of the principle of Federal supremacy embodied in the Constitution, this order is not intended, nor should it be interpreted, to require Federal facilities to comply with State or local administrative procedures with respect to pollution abatement and control.
 
 
 23
 The new Executive Order will not support the plaintiffs' argument. But it does not foreclose the argument based on 118. While the Order seeks to further 'the purpose and policies of the Clean Air Act,' it does not purport to be an authoritative administrative interpretation of that section[12] but is instead an independent order based on the executive authority of the President over federal employees and facilities. It cannot, of course, modify an Act of Congress, nor does it appear to be an exercise of the authority granted the President under 118 to exempt federal facilities from certain requirements. Exercise of that authority contemplates a case by case determination that the exemption is 'in the paramount interest of the United States.' It does not authorize a blanket exemption of all federal facilities from specified requirements, and we do not construe Executive Order 11752 as an attempt to provide such an exemption.[13]
 
 
 24
 The judgment of the District Court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.
 
 SIMPSON, Circuit Judge (dissenting):
 
 25
 With deference, I dissent. I would affirm the district court on the authority of the Sixth Circuit decision, Commonwealth of Kentucky ex rel. Hancock v. Ruckelshaus, Administrator, etc., et al., 6 Cir. 1974, 497 F.2d 1172,[1] affirming Commonwealth of Kentucky ex rel. Hancock v. Fri, W.D.Ky.1973, 362 F.Supp. 360.
 
 
 26
 Without a clearer expression than I discern either in Section 118 (Title 42, U.S.C. 1857f) or in the Act's inconclusive legislative history, I am unwilling to attribute to Congress an implied consent for the several states to apply state permit requirements to facilities operated within their borders by agencies and instrumentalities of the federal government, here specifically the Department of the Army and The Tennessee Valley Authority. Speculation and conjecture, however persuasively set forth, should not override the Supremacy Clause, Art. VI, Clause 2, of the United States Constitution.
 
 
 
 [1]
 In the District Court the defendants also included officials of the Environmental Protection Agency. The District Court dismissed the complaint as to them, and plaintiffs do not appeal therefrom
 
 
 [2]
 1.12 Permits
 
 
 [1]
 12.1 Permits Required
 (a) Permit to Construct. Any person building, erecting, altering or replacing any article, machine, equipment or other contrivance, the use of which may cause the issuance of or an increase in the issuance of air contaminants or the use of which may eliminate or reduce or control the issuance of air contaminants, shall first obtain authorization for such construction from the Director in the form of a Permit to Construct. A Permit to Construct shall remain in effect until the permit to operate the equipment for which the application was filed is granted or denied or the application is canceled.
 (b) Permit to Operate.
 (1) Before any article, machine, equipment or other contrivance described in paragraph (a) may be operated or used, a written permit shall be obtained from the Director. No permit to operate shall be granted for any article, machine, equipment or contrivance described in paragraph (a), constructed or installed without out authorization as required by paragraph (a), until the information required as presented to the Director and such article, machine, equipment or contrivance is altered, if necessary, and made to conform to the standards established by the Commission.
 (2) Any article, machine, equipment or other contrivance described in paragraph (a) which is presently operating (or which is not presently operating but which is capable of being operated) without a Permit to Oerate, may continue to operate (or may restart) only if its owner or operator obtains a Permit to Operate prior to a date to be set by the Director (or prior to restarting).
 (3) The Director shall have the authority to decide cases where an article, machine, equipment, or other contrivance is not clearly subject to nor exempt from the application of this Part. In addition, the Director may rule that a particular article, machine, equipment or other contrivance is subject to the application of this Part even though it is exempt from the system according to Sections 1.12.1 and 1.12.2 of this Part. The operator or builder of such an article, a machine, equipment or other contrivance may appeal the Director's classification to the Commission, which shall overrule the Director only if it is shown that he acted arbitrarily and contrary to the purposes of the Act.
 (b) The Director shall deny a permit if the applicant does not present, in writing, a plan whereby the emission of air contaminants by every article, machine, equipment, or other contrivance described in the permit application, will be reduced during periods of an Air Pollution Alert, Air Pollution Warning, and Air Pollution Emergency in accordance with the provisions ofChapter 2.
 (c) Before a Permit to Construct or Permit to Operate is granted, the Director may require the applicant to provide and maintain such facilities as are necessary for sampling and testing purposes in order to secure information that will disclose the nature, extent, quantity or degree of air contaminants discharged into the atmosphere from the article, machine, equipment or other contrivance described in the Permit to Construct or Permit to Operate. In the event of such a requirement, the Director shall notify the applicant in writing of the required size, number and location of the sampling platform; the access to the sampling platform; and the utilities for operating the sampling and testing equipment.
 (d) The Director may also require the applicant to install, use and maintain such monitoring equipment or methods; sample such emissions in accordance with such methods, at such locations, intervals and procedures as may be specified; and provide such information as the Director may require.
 
 
 [1]
 12.7 Provision of Sampling and Testing Facilities. A person operating or using any article, machine, equipment or other contrivance for which these rules and regulations require a permit shall provide and maintain such sampling and testing facilities as specified in the Permit to Construct or Permit to Operate
 
 
 [1]
 12.8 Standards for Granting Applications
 (a) The Director shall deny a permit except as provided by Section 1.12.9, if the applicant does not show that every article, machine, equipment or other contrivance, the use of which may cause the issuance of air contaminants, is so designed, controlled, or equipped with such air pollution control equipment, that it may be expected to operate without emitting or without causing to be emitted air contaminants in violation of these rules and regulations.
 (h) In granting any Permit to Operate, the Director may allow, as a condition of such permit, for the intermittent discharge of air contaminants, during startup, shut down, rate change or load change, in excess of the limitations specified in these rules and regulations where he finds that because of the nature of the source there is no practicable alternative.
 
 
 [1]
 12.9 Conditional Permit
 (a) The Director may issue a Permit to Construct or a Permit to Operate subject to conditions which will bring the operation of any article, machine, equipment or other contrivance within the standards of Section 1.12.8, in which case the conditions shall be specified in writing. Commencing work under such a Permit to Construct or a Permit to Operate shall be deemed acceptance of all the conditions specified. The Director shall issue a Permit to Construct or a Permit to Operate with revised conditions upon receipt of a new application, if the applicant demonstrates that the article, machine, equipment or other contrivance can operate within the standards of Section 1.12.8 under the revised conditions.
 (b) A Conditional Permit may allow an article, machine, equipment or other contrivance to be operate in violation of the conditions of Section 1.12.8 if one of the conditions of the permit is a definite schedule by which the article, machine, equipment, or contrivance may attain the conditions of Section 1.12.8 and be granted a Permit to Operate, and if the schedule provides for attaining the conditions of Section 1.12.8 at the earliest possible date and is approved by the Director. A Conditional Permit will be revoked if the applicant does not submit progress reports to the Director according to the schedule established by the Conditional Permit. The Director may further revoke the Conditional Permit if the progress reports do not show satisfactory progress as specified by the terms of the Conditional Permit or if the progress reports are found to be inaccurate.
 
 
 [1]
 12.11 Denial of Application. In the event of denial of a Permit to Construct or Permit to Operate, the Director shall notify the applicant in writing of the reason therefor. Service of this notification may be made in person or by mail, and such service may be proved by written acknowledgement of the persons served or affidavit of the person making the service. The Director shall not accept a further application unless the applicant has complied with the objections specified by the Director as its reasons for denial of the Permit to Construct or the Permit to Operate
 
 
 [1]
 12.12 Appeals. Within 10 days after notice by the Director of denial or conditional approval of a Permit to Construct or Permit to Operate, the applicant may petition the Commission, in writing, for a review. The Commission may sustain or reverse the action of the Director; such order may be made subject to specified conditions
 
 
 [1]
 12.13 The holder of a Permit under this Part shall comply with conditions contained in such Permit as well as all applicable provisions of these rules and regulations ulations except where violations are specifically allowed in accordance with a Conditional Permit issued under Section 1.12.9
 
 
 [3]
 We are left to guess at the District Court's reasons for its order granting summary judgment since it gave none. See Steed v. Central of Ga. Ry. Co., 477 F.2d 1303, 1305 (CA5, 1973), as to the desirability of the court's stating its grounds though not required by Rule 56 to do so. Especially is that true in a case of such national importance as this. Amici curiae filing briefs in this court include the states of California, Kentucky, Maine, New York, Ohio and Texas
 
 
 [4]
 Section 111 (42 U.S.C. 1857c-6) provides for establishment by the Administrator of EPA of emission standards for new sources of air pollution. Subdivision (c)(1) of the section provides:
 'Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards (except with respect to new sources owned or operated by the United States).'
 Section 112 (42 U.S.C. 1857c-7) provides for EPA establishment of emission standards for hazardous air pollutants not covered by ambient air quality standards. In language parallel to that contained in 111(c)(1), subsection (d) (1) of 112 provides for delegation of implementation and enforcement authority to the states 'except with respect to stationary sources owned or operated by the United States.'
 Section 114 (42 U.S.C. 1857c-9) provides in part:
 '1857c- 9. Recordkeeping, inspections, monitoring, and entry-- Authority of Administrator or authorized representative '(a) For the purpose (i) or developing or assisting in the development of any implementation plan under section 1857c-- 5 or section 1857c-- 6(d) of this title, any standard of performance under section 1857c-- 6 of this title, or any emission standard under section 1857c-7 of this title, (ii) of determining whether any person is in violation of any such standard or any requirement of such a plan, or (iii) carrying out section 1857h-- 1 of this title--
 (1) the Administrator may require the owner or operator of any emission source to (A) establish and maintain such records, (B) make such reports, (C) install, use, and maintain such monitoring equipment or methods, (D) sample such emissions (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (E) provide such other information as he may reasonably require; and
 (2) the Administrator or his authorized representative, upon presentation of his credentials--
 (A) shall have a right of entry to, upon, or through any premises in which an emission source is located or in which any records required to be maintained under paragraph (1) of this section are located, and
 (B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which the owner or operator of such source is required to sample under paragraph (1).
 Enforcement procedure by State; delegation of authority of Administrator to State; power of Administrator unaffected
 '(b)(1) Each State may develop and submit to the Administrator a procedure for carrying out this section in such State. If the Administrator finds the State procedure is adequate, he may delegate to such State any authority he has to carry out this section (except with respect to new sources owned or operated by the United States).'
 
 
 [5]
 Defendants argue that the state could seek to enforce its emission limitations by resort to court actions under the 'citizens suits' provision, 304 (42 U.S.C. 1857h-2) of the Act. Irrespective of the merits of this suggestion, we believe that 304 provides little guidance to determining the Congressional purpose in enacting 118. Our reasons are discussed in Part III infra
 
 
 [6]
 This approach necessarily leads them to de-emphasize the remainder of the phrase, which reads 'to the same extent that any person is subject to such requirements.'
 
 
 [7]
 The Sixth Circuit also noted the 'lack of support' for plaintiffs' interpretation of 118 in Executive Order No. 11507. That Order was promulgated in February 1970, while the Clean Air Act Amendments were not approved until December 31, 1970
 
 
 [8]
 Other bits and pieces of legislative history are similarly inconclusive. Some statements resemble the Conference Report statement quoted in the text. See Library of Congress for the Senate Comm. on Public Works, 93d Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1970 (Comm. Print 1974) at 423 (S.Rep.No.91-1196, supra, at 23: 'This section requires that Federal facilities meet the emission standards necessary to achieve ambient air quality standards as well as those established in other sections of Title I.'); 894 (H.Rep.No. 91-1146, supra: 'The legislation directs Federal agencies . . . to comply with applicable Federal, State, interstate, and local emission standards.'); 904-905 (H.Rep.No. 91-1146, supra: statement paralleling that cited at 894.). Other statements appear to imply that 118 should be given an expansive interpretation. See Id. at 131 (Sen. Muskie's Summary of the Conference Agreement: 'The agreement requires Federal facilities to control air pollution.'); 459 (S.Rep.No.91-1196, supra, at 59: 'This section directs that all Federal agencies shall comply with the requirements of the Act just as a nonfederal agency or individual must do in the administration of any real property or facility and in the conduct of any activity.')
 
 
 [9]
 Except that he may not grant an exemption 'due to lack of appropriation' unless the appropriation was requested by the President and denied by the Congress
 
 
 [10]
 Thus, 101(a)(3) declares 'the prevention and control of air pollution at its source is the primary responsibility of States and local governments . . .,' and 110(a)(2)(F)(i) requires state implementation plans to contain 'assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan.'
 
 
 [11]
 See, e.g., A Legislative History of the Clean Air Amendments of 1970, note 8, supra, at 127 (Remarks of Sen. Muskie on the Conference Report: 'The bill extended the concept of public participation to the enforcement process.'); 205-206 (Conference Report); 436-439 (Senate Report)
 
 
 [12]
 TVA contends that EPA has officially interpreted 118 as not requiring federal facilities to comply with state permit requirements. TVA refers us to a 1972 letter to it from the Regional Administrator of EPA and a 1973 memorandum to federal departments and agencies from the Administrator. These documents indicate an EPA position that federal facilities need not obtain permits, a fact which we have duly noted in reaching our decision, but because they offer no reasoning to support that position they provide slight guidance. The 1973 memorandum, moreover, contains the following statement:
 'If a State's compliance schedule process is based on a permit system, I would ask that your facilities provide the State with the required information on its registration form. I believe the form should be signed to verify the data, but with an appropriate disclaimer to make it clear that the facility is not applying for a permit. (If you have instructed your facilities to apply for a State permit, the disclaimer would, of course, be unnecessary.) As you know, there are several court cases now underway to determine the legality of State permits for Federal facilities. I believe that while the courts resolve this issue the Federal government should proceed with great urgency to ensure that every source in violation of air quality standards and emission limitations is covered by an approved compliance schedule and that resources and funds are marshalled in order to adhere to these schedules.'
 The parenthetical statement seems to imply that EPA does not oppose in principle requiring state permits for federal facilities, and the reference to cases under way appears to indicate an attitude of deferring to the courts on the proper interpretation of 118.
 
 
 [13]
 The Executive Order itself appears to recognize the necessity for a case by case determination. Section 5 thereof delegates to the heads of federal agencies and the Administrator of EPA the power to 'identify facilities or uses thereof' which are exempted from air quality standards and emission limitations effective under the Clean Air Act and applicable under Section 4 of the Executive Order. Exercise of this power of exemption with respect to a facility would render moot any state permit requirement with respect to that facility since the necessity for a permit derives from the emission limitation requirement
 
 
 [1]
 See also People of State of California v. Captain Stastny, C.O. of Long Beach Naval Air Station, C.D.Cal.1972, 4 ERC 1447, presently pending on appeal to the Ninth Circuit, appeal docketed November 6, 1972, No. 72-2905