558 F.2d 1347
 10 ERC 1623, 9 ERC 2062, 7 Envtl. L.
Rep. 20,351,
7 Envtl. L. Rep. 20,801
 UNITED STATES of America, Plaintiff-Appellee,
v.
The STATE OF CALIFORNIA, State Water Resources Control
Board, W. W. Adams, Chairman, Ronald B. Robie, Vice
Chairman, Roy E. Dodson, Jean Auer, and W. Don Maughan, as
members of the State Water Resources Control Board,
Defendants-Appellants.
 No. 75-3554.
 United States Court of Appeals,
Ninth Circuit.
 April 1, 1977.
Rehearing Denied Aug. 12, 1977.
 
 Evelle J. Younger, Atty. Gen., Carl Boronkay, Asst. Atty. Gen., Rokerick E. Walston, argued, and Richard C. Jacobs, Deputy Attys. Gen., San Francisco, Cal., for defendants-appellants.
 Carl Strass, Atty., argued, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before DUNIWAY, CARTER and WALLACE, Circuit Judges.
 DUNIWAY, Circuit Judge:
 
 
 1
 The State of California and its State Water Resources Control Board appeal from judgment for the United States entered by the District Court for the Eastern District of California. The opinion and judgment of that court was reported in United States v. State of California, E.D.Cal., 1975, 403 F.Supp. 874. The judgment of the district court appears at 403 F.Supp. 902-03. The principal questions are (1) whether Section 8 of the Reclamation Act of 1902, 32 Stat. 388, now 43 U.S.C. § 383, requires that the United States apply to the California State Water Resources Control Board for a permit to appropriate unappropriated water from the Stanislaus River for the New Melones project, and, (2) if so, what conditions, if any, the Board can attach to a permit that it grants. The questions are of great importance, and we have given them careful attention.
 
 
 2
 Our study of the record and the law convinces us that the judgment must be affirmed, substantially for the reasons stated by Judge MacBride in his opinion.
 
 
 3
 Two recent decisions of the Supreme Court strengthen our conviction. In Hancock v. Train, 1976, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555, the question was whether § 118 of the Clean Air Act, 42 U.S.C. § 1857f, permits a state to require federally owned or operated installations to obtain a permit to operate, as required by the state's federally approved plan for assuring air quality. The pertinent language of § 118 reads:
 
 
 4
 Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements.
 
 
 5
 42 U.S.C. § 1857f.
 
 The Court states its holding as follows:
 
 6
 Kentucky, like the Court of Appeals for the Fifth Circuit in Alabama v. Seeber, 502 F.2d 1238, 1247-1248 (1974), finds in § 118 a sufficient congressional authorization to the States, not only to establish the amount of pollutants a federal installation may discharge, but also to condition operation of federal installations on securing a state permit. We disagree because we are not convinced that Congress intended to subject federal agencies to state permits. We are unable to find in § 118, on its face or in relation to the Clean Air Act as a whole, or to derive from the legislative history of the Amendments any clear and unambiguous declaration by the Congress that federal installations may not perform their activities unless a state official issues a permit. Nor can congressional intention to submit federal activity to state control be implied from the claim that under Kentucky's EPA-approved implementation plan it is only through the permit system that compliance schedules and other requirements may be administratively enforced against federal installations. Id. at 180-81, 96 S.Ct. at 2013.
 
 
 7
 In view of the undoubted congressional awareness of the requirement of clear language to bind the United States, our conclusion is that with respect to subjecting federal installations to state permit requirements, the Clean Air Act does not satisfy the traditional requirement that such intention be evinced with satisfactory clarity. Should this nevertheless be the desire of Congress, it need only amend the Act to make its intention manifest. Id. at 198, 96 S.Ct. at 2021.22 (footnotes omitted).
 
 
 8
 In Environmental Protection Agency v. California ex rel. State Water Resources Control Board, 1976, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578, the Court reached a similar conclusion as to the effect of § 313 of the Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U.S.C. § 1323. That section provides that federal installations must "comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements." California and Washington sought to apply the permit requirements of their programs. We held that they could do so (511 F.2d 963), but the Supreme Court reversed. Applying the principles of Hancock, supra, the Court said:
 
 
 9
 Our decision in this case is governed by the same fundamental principles applied today in Hancock v. Train, ante, (426 U.S.) at 179 (, 96 S.Ct. 2006, 48 L.Ed.2d 555): federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous. Id. at 211, 96 S.Ct. at 2028.
 
 
 10
 Except for the reference to service charges, § 313 is virtually identical to § 118 of the Clean Air Act, 42 U.S.C. § 1857f. Taken alone, § 313, like § 118 of the Clean Air Act, states only to what extent the same as any person federal installations must comply with applicable state requirements. Section 313 does not expressly provide that federal dischargers must obtain state NPDES permits. Nor does § 313 or any other section of the Amendments expressly state that obtaining a state NPDES permit is a "requirement respecting control or abatement of pollution." Id. at 212-13, 96 S.Ct. at 2028 (footnotes omitted).
 
 
 11
 The language of § 8 of the Reclamation Act of 1902, set out in the opinion of the district court, 403 F.Supp. 885, is no more specific in subjecting federal projects to state permit requirements than are the statutes construed in the foregoing cases. Our view that the judgment in this case should be affirmed is, we think, supported by the principles applied in those cases. Indeed, we find that California's claim in this case that the United States must obtain a permit and comply with conditions embodied in it is less supportable than the claims of Kentucky in Hancock, supra, and of California and Washington in Environmental Protection Agency, supra. In each of those cases, it could more plausibly be argued that Congress did intend to subject federal installations to state permit requirements than in this case. When the Congress enacted § 118 of the Clean Air Act and § 313 of the Water Pollution Control Act Amendments of 1972, the use by the state of the permit device as a means of enforcing their laws in these areas was well known. The language of the two acts, subjecting federal instrumentalities to state laws, is very broad. Yet the Court declined to read either section as requiring compliance with state permit requirements.
 
 
 12
 On the other hand, when § 8 of the Reclamation Act was adopted in 1902, California's permit requirement did not exist. At that time, under the Civil Code of 1872, §§ 1410-1422, surplus water was appropriated by the physical act of taking and diverting it to beneficial use. An appropriator could post a notice of taking at the point of diversion and record a copy with the county recorder. If the appropriator was diligent in completing the work for the diversion, his rights would date back to the posting of the notice. The statute did not create appropriative rights; it merely provided evidence of the date of appropriation. A fortiori, then, we cannot read § 8 as requiring compliance with California permit requirements that did not exist when § 8 was adopted.
 
 
 13
 In 1913, California enacted the Water Commission Act (Cal.Stats.1913, c. 586) which created the State Water Commission and provided a statutory procedure that could be followed in the appropriation of unappropriated water flowing in any natural channel "for useful and beneficial purposes." The Act became effective, following a referendum vote, in 1914. In 1923, an amendment made the statutory procedure the exclusive method of appropriating water. (Cal.Stats.1923, c. 87.) The Act, as amended, is now part of the California Water Code, Divisions 1 and 2.
 
 
 14
 As the district judge concluded, a major purpose of § 8 of the 1902 Act was to recognize and protect state water law, particularly the state law doctrine of appropriative rights to water. 403 F.Supp. at 888. Similarly, the Clean Air Act and the Water Pollution Control Act amendments give effect to state law and require compliance with it by federal installations. Indeed, those acts are more specific than § 8 of the 1902 Act. Yet the Court has declined to read them as subjecting federal installations to state permit requirements, even though the use of permits by the states as a means of enforcing their clean air and water pollution laws was known. To read § 8 of the 1902 Act as requiring compliance with laws that did not then exist and procedures not made compulsory by California until 1923 over 20 years later would fly in the face of the Hancock and Environmental Protection Agency decisions. We could only do so if the language of § 8 were much more specific than it is.
 
 
 15
 In one respect, however, we disagree with Judge MacBride's decision. He says, 403 F.Supp. 889-90:
 
 
 16
 Indeed, while the Congressional history of the 1902 Act indicates broad federal purpose and authority in the operation and control of federal reclamation projects, the comity inherent in a federal system would not permit an overbroad usurpation of state sovereignty. Accordingly, the federal government is required, when acquiring water for federal reclamation projects, to comply with the forms of state law, including application to state water boards where necessary, for two purposes: (1) to enable the state to determine, according to its law, whether there is sufficient unappropriated water available for the project; and (2) to give notice to the state of the scope of the project.
 
 His judgment provides:
 
 17
 (1) The United States can appropriate unappropriated water necessary for use in any federal reclamation project within the State of California, but must first, in accordance with comity, apply to the California State Water Resources Control Board for a determination by that Board of the availability of unappropriated water.
 
 
 18
 (2) When the United States submits applications to the California State Water Resources Control Board, that Board must grant such applications if unappropriated waters are available.
 
 
 19
 We agree with this result, but we do not agree that the requirement is one of comity. It is legal requirement of § 8.
 
 
 20
 Under § 8, the national government, in constructing and administering reclamation projects, must recognize and cannot nullify either water rights created by state laws or the laws that create them. But enforcement of the government's duty via the permit device is not handed over to the state.
 
 
 21
 The phrase "in accordance with comity" is stricken from paragraph (1) of the judgment. In all other respects, the judgment is affirmed.
 
 
 22
 JAMES M. CARTER, Circuit Judge, concurring specially:
 
 
 23
 I concur in the above opinion. Hancock v. Train, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), and Environmental Protection Agency v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), make improper, under existing statutes, any state requirements in the nature of permits. The cases hold that is is for the Congress to explicitly determine whether to subject federal agencies to state permits.
 
 
 24
 I would suggest, however, that it may be one thing for the Congress to provide that a state may require a permit to assure proper air or water quaity standards of a federally-owned or operated installation; it is quite another thing to permit a state to require permits for the very operation of such a facility. I cannot envision the Congress providing that the states, by a permit process, may control the operation of federally constructed, funded, and oprated water and power projects.
 
 
 25
 WALLACE, Circuit Judge, concurring and dissenting:
 
 
 26
 Although recent Supreme Court decisions leave me with no clear concept of what Congress must say in order to require the federal government to comply with state law, I am persuaded that the language of the statute reviewed here is insufficient to validate California's permit procedure. While the "shall" in section 8 of the 1902 Reclamation Act appears to be mandatory, and while the Bureau of Reclamation's conduct over nearly three-quarters of a century indicates that it had no doubt of the necessity for compliance with state law, I cannot say that the language of the section is any clearer or less equivocal than that rejected as insufficient in Hancock v. Train, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), and EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Thus, with reluctance I concur that the statute does not require the Bureau of Reclamation to secure, pursuant to state law, the permit in question.
 
 
 27
 However, unlike the majority,[1] I would go no further. Nothing in Hancock or EPA necessarily forecloses federal compliance with state-imposed requirements not involving permits. Indeed, the more than 70 years of cooperative development of water resources in the West under the Reclamation Act attest to the wisdom in providing non-exclusive control over this limited asset.
 
 
 28
 Also, I believe that we must disapprove that portion of the district court's order that requires the federal government, "in accordance with comity, (to) apply to the California State Water Resources Control Board for a determination by that Board of the availability of unappropriated water" and that requires the Board to "grant such applications if unappropriated waters are available." United States v. State of California, supra, 403 F.Supp. at 902. By construing section 8 under compulsion of Hancock and EPA as not requiring Bureau of Reclamation compliance with state appropriation procedures, we bring an element of uncertainty to the administration of water resources. Absent some mechanism to convey the information, the states cannot know what amount of unappropriated water remains for private use in a watershed after a portion is appropriated by the Bureau. The "comity" theory and application/notice requirement of the district court are an effort to patch this tear caused by the new construction of section 8.
 
 
 29
 It is a wayward effort. Comity is a concept of deference and voluntary action. Zink v. Estelle, 403 F.Supp. 656, 659 (S.D.Tex.1975); Galloway v. Watts, 395 F.Supp. 729, 731 (D.Md.1975). To use such a concept as a basis for requiring affirmative federal action seems peculiarly incongruous. Accordingly, I agree with the majority's disapproval of the district court's comity theory.
 
 
 30
 But the majority does no better in its effort for it provides no defensible basis for requiring federal agency action. Accordingly, I must reject that portion of the majority's opinion which directs the federal government "to comply with the forms of state law" (emphasis added) because "(i)t is a legal requirement of § 8." Majority op. at 1243.[2]
 
 
 31
 Concededly where two sovereigns, acting independently, administer water rights in the same watershed, there is a great potential for uncertainty. But that is what our Hancock - and EPA -inspired construction of section 8 means. The majority has failed to find a defensible legal basis to give effect to its desire to avoid this problem. Unfortunately, I can see no such basis either. Accordingly, we have, I believe, no alternative but to leave it to the legislative branch to devise a solution. Therefore, I would go no further than to disapprove the permit procedure in question.
 
 On Petition for Rehearing
 
 32
 In its petition for a rehearing, California relies upon an argument that it made, but did not emphasize, in its briefs on appeal, an argument that we overlooked. It points to the fact that certain of the permits involved in this case had their origin in two applications filed by the State Department of Finance. These applications were then assigned by the Department to the Bureau of Reclamation. The State points out that its Department of Finance, had it prosecuted the applications to the obtaining of permits, would certainly have been bound by whatever conditions the State Board might impose. It follows, says the State, that the Bureau, assignee, is also subject to those conditions because, as assignee, it could acquire no greater rights than its assignor. The argument is superficially appealing, but, on reflection, we reject it.
 
 
 33
 The argument overlooks two considerations. The first is that the assignment was of an application, not of a permit containing conditions. The second is that the assignee was the Bureau, a Federal agency exercising powers conferred upon it by the Congress of the United States, whose valid enactments are "the supreme Law of the Land" (U.S.Const. Art. VI, cl. 2).
 
 
 34
 Under California law, an application for a permit to appropriate surplus or unappropriated water confers nothing upon the applicant as against the state; all that it confers is a priority over later applicants if the application is granted. Cal.Water Code § 1450 states:
 
 
 35
 Any application properly made gives to the applicant a priority of right as of the date of the application until such application is approved or rejected. Such priority continues only so long as the provisions of law and the rules and regulations of the board are followed by the applicant.
 
 
 36
 Cal.Water Code § 1455 then adds: "The issuance of a permit continues in effect the priority of right as of the date of the application . . . ."
 
 
 37
 The Supreme Court of California interpreted these provisions in Madera Irrigation District v. All Persons, 1957, 47 Cal.2d 681, 690, 306 P.2d 886, 891 rev'd on other grounds, Ivanhoe Irrigation District v. McCracken, 1958, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313. There the court stated:
 
 
 38
 The filing of an application under the present law is comparable and of like effect to the posting and recording of notice or commencement of actual construction work under the rules which had previously prevailed. . . . The Water Code provides that the effect of filing an application confers, for all practical purposes, a priority only.
 
 
 39
 To the same effect, see United States v. Fallbrook Public Utility District, S.D.Cal., 1958, 165 F.Supp. 806, where Judge James M. Carter stated (at 855):
 
 
 40
 Until the application to appropriate is acted upon by the State Water Rights Board favorably to the applicant, and the issuance of a permit is directed, the applicant has no property right of any kind as against the state. He has an inchoate, incipient, conditional right of procedural priority over later applicants. . . .
 
 
 41
 That is all that the State Department of Finance had, and all that it could assign to the Bureau.
 
 
 42
 When the Bureau became the assignee of that "inchoate, incipient, conditional right," it was acting in the same capacity as when it filed its own applications. It was acting under the same Federal laws, and, absent those laws, it would have had no right to appropriate any water. Its substantive rights arose from the Congressional legislation, not from the assignment. There is no contention that the assignment was expressly conditioned upon acceptance of whatever permit conditions the State might impose. On the contrary, the State's briefs make it clear that the State Department of Finance filed the applications for one purpose only, to obtain, not for itself, but for the Bureau when the project finally went forward, a priority date as appropriator.[1]
 
 
 43
 We conclude that the Bureau, as assignee of an application, is no more subject to the imposition of conditions by the Board than it is as an original applicant.
 
 
 44
 The petition for a rehearing is denied.
 
 WALLACE, Circuit Judge, concurring in part:
 
 45
 I concur in part. Concluding that the first of Judge Duniway's reasons to deny the petition is more than adequate ("the assignment was of an application, not of a permit containing conditions"), I would not reach the constitutional issue. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).
 
 
 
 [1]
 The majority's approach to the permit issue seems to be premised on the belief that the impermissible aspect of the state's scheme is not the permit requirement but rather the conditions the state has attached to the permit. California has conceded all along that, although the Bureau must seek and secure a permit, the state has no power to attach to the permit conditions inconsistent with or contradictory to congressional purposes underlying the particular reclamation project. California believes, however, that no such conflict exists in this case
 In a proceeding before a state agency, it was determined that the conditions imposed by California were valid. The federal government did not appeal this decision. Accordingly, the government conceded at oral argument that it is precluded by the doctrine of res judicata from raising the issue anew in this case.
 
 
 [2]
 While the majority fails to provide us with any legal reasoning for requiring compliance with "the forms of state law," I can only assume that the requirement is derived from federal common law. Before embarking on this new and uncharted course of constructing common law, I would ask: Do we have the legal competency to fashion any rules in this area? Even if we do, is it wise for us to undertake the task? While I entertain doubts that the first question can be answered affirmatively, I am convinced that we ought not undertake the task of judicial rulemaking in an area as complex and sensitive as state-federal relation over water
 If my assumption regarding the federal character of the application/notice requirement is incorrect, then that requirement must be viewed as one of state law. If derived from state law, there would be an inconsistency with the majority's initial conclusion that section 8 does not require federal agency compliance with state permit procedures.
 
 
 [1]
 Originally, the Central Valley Project, of which New Melones is a part, was to be constructed and operated by the State. Therefore, as California told us in its opening brief, its Department of Finance began in 1927 filing applications for permits to appropriate water for the Central Valley Project,
 so that the State in anticipation of State construction of the CVP could obtain a prior right to the use of water, as against private appropriators who submitted later applications; . . . .
 (Brief, page 5)
 As noted earlier, Decision 1422 approved the assignment of two applications to the Bureau, and issued permits to the Bureau on the basis of these applications; these applications had originally been filed by a State agency for the purpose of obtaining an early priority date.
 (Brief, pages 83-84)
 There is a similar assertion in California's Reply to Response to Petition for Rehearing, page 6:
 (T)he State Department of Finance, in applying for water rights in 1927, did not apply for the purpose of ultimately encumbering the Bureau's water rights. Rather, it applied because it was expected that the State rather than the federal government would build and operate the Central Valley Project, and the State wanted to obtain the earliest possible priority dates in its own water rights.
 (footnote omitted)
 It was apparent in 1944 that New Melones was to be built and operated as a Federal Project. It was authorized in the Flood Control Act of 1944, 58 Stat. 887. See also § 203 of the Flood Control Act of 1962, 76 Stat. 1191. Thus, when the State applied for water rights for New Melones in 1952, its purpose was, as it says, to obtain early priority dates, and its intent must have been to do what it ultimately did, to assign its applications to the Bureau of Reclamation, which was to build and operate the project.