HANCOCK, ATTORNEY GENERAL OF KEN-
TUCKY *v.* TRAIN, ADMINISTRATOR,
ENVIRONMENTAL PROTECTION
AGENCY, ET AL.

No. 74–220.   Argued January 13, 1976—Decided June 7, 1976

WHITE, J., delivered the opinion of the Court in which BURGER,
C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS,
JJ., joined. STEWART and REHNQUIST, JJ., filed a dissenting
statement, *post,* p. 199.

*David D. Beals,* Assistant Attorney General of Ken-
tucky, argued the cause for petitioner. With him on
the briefs were *Ed W. Hancock,* Attorney General, *pro
se,* and *David C. Short,* Assistant Attorney General.

*Deputy Solicitor General Friedman* argued the cause
for respondents. On the brief were *Solicitor General
Bork, Assistant Attorney General Johnson, Deputy Solic-*

*itor General Randolph, Jacques B. Gelin, Robert L. Klar-quist, Robert H. Marquis, Herbert S. Sanger, Jr.,* and *Beauchamp E. Brogan.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The question for decision in this case is whether a State whose federally approved implementation plan forbids an air contaminant source to operate without a state permit may require existing federally owned or operated installations to secure such a permit. The case presents an issue of statutory construction requiring examination of the Clean Air Act, as amended, 42 U. S. C. § 1857 *et seq.*, and its legislative history in light of established constitutional principles governing the determination of whether and the extent to which federal installations have been subjected to state regulation.[1] The specific question is whether obtaining a permit to operate

---

*Briefs of *amici curiae* urging reversal were filed by *William J. Baxley,* Attorney General, and *Henry H. Caddell* and *Frederick S. Middleton III,* Assistant Attorneys General, for the State of Alabama; by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Philip Weinberg* and *Richard G. Berger,* Assistant Attorneys General for the State of New York; by *John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Philip K. Maxwell,* Assistant Attorney General, for the State of Texas; by *Andrew P. Miller,* Attorney General, and *J. Thomas Steger,* Assistant Attorney General, for the Commonwealth of Virginia; and by *Evelle J. Younger,* Attorney General, *Robert H. O'Brien* and *Carl Boronkay,* Assistant Attorneys General, and *Nicholas C. Yost, Roderick Walston, Daniel Taaffe,* and *C. Foster Knight,* Deputy Attorneys General, for the State of California et al., joined by *Arthur K. Bolton,* Attorney General, and *Robert E. Hall,* Assistant Attorney General, for the State of Georgia.

[1] In *EPA* v. *California ex rel. State Water Resources Control Board, post,* p. 200, also decided this day, we consider a closely related issue under the Federal Water Pollution Control Act, as amended, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp. IV).

is among those "requirements respecting control and abatement of air pollution" with which existing federal facilities must comply under § 118 of the Clean Air Act.[2]

I

Last Term in *Train* v. *Natural Resources Defense Council*, 421 U. S. 60 (1975), we reviewed the development of federal air pollution legislation through the Clean Air Amendments of 1970 (Amendments)[3] and observed that although the Amendments "sharply increased federal authority and responsibility in the continuing effort to combat air pollution," they "explicitly preserved the principle" that " '[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ,' " *id.*, at 64, quoting from § 107 (a) of the Clean Air Act, as added, 84 Stat. 1678, 42 U. S. C. § 1857c-2 (a). Consistently with this principle, the Amendments required that within nine months after the Environmental Protection Agency (EPA) promulgated the primary and secondary ambient air quality standards required by § 109 (a) of the Clean Air Act, as added, 84 Stat. 1679, 42 U. S. C. § 1857c-4 (a),[4] for certain air pollutants,[5] each State submit to the EPA a plan by which it would implement and maintain those standards within its territory. § 110 (a)(1) of the Clean Air Act, as added, 84 Stat. 1680, 42 U. S. C. § 1857c-5 (a)(1). See 40 CFR pt. 51 (1975). The EPA was required to approve each State's

---

[2] As renumbered and amended, 84 Stat. 1689, 42 U. S. C. § 1857f.

[3] Pub. L. 91-604, 84 Stat. 1676.

[4] 36 Fed. Reg. 8186 (1971). See 40 CFR pt. 50 (1975). Title 40 CFR § 50.1 (e) (1975) defines "ambient air" as "that portion of the atmosphere, external to buildings, to which the general public has access."

[5] The EPA is guided in compiling a list of air pollutants by § 108 (a) of the Clean Air Act, as added, 84 Stat. 1678, 42 U. S. C. § 1857c-3 (a).

implementation plan as long as it was adopted after public hearings and satisfied the conditions specified in § 110 (a)(2).

For existing sources [6] the State must propose "emission limitations, schedules, and timetables for compliance with such limitations" necessary to meet the air quality standards. § 110 (a)(2)(B). As we observed in *Train, supra,* at 78–79, given the EPA's nationwide air quality standards, the State is to adopt a plan setting

> "the specific rules to which operators of pollution sources are subject, and which if enforced should result in ambient air which meets the national standards.
>
> "[The EPA] is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. . . . The Act gives [the EPA] no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110 (a) (2). . . . Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation."   (Footnote omitted.)

Along with increasing federal authority and "taking a stick to the States" [7] by requiring them to implement the

---

[6] The range of a State's initiative in meeting its primary responsibility to assure air quality is somewhat greater for existing sources of air pollution, such as those involved in this case, than for "new sources." See *infra,* at 190–194.

[7] *Train* v. *Natural Resources Defense Council,* 421 U. S. 60, 64 (1975).

federal standards promulgated pursuant to that authority, Congress also intended the Amendments "to strengthen the strictures against air pollution by federal facilities." [8]  Before 1970, § 111 (a) of the Clean Air Act simply declared "the intent of Congress" to be that federal installations "shall, to the extent practicable and consistent with the interests of the United States and within any available appropriations, cooperate with" federal and state air pollution control authorities "in preventing and controlling the pollution of the air in any area insofar as the discharge of any matter from or by such" federal installation "may cause or contribute to pollution of the air in such area." [9]

Experience with performance by federal sources of air pollution under this voluntary scheme [10] led the Congress to conclude that admonishing federal agencies to prevent and control air pollution was inadequate, because "[i]nstead of exercising leadership in controlling or eliminating air pollution" [11] "Federal agencies have been notoriously laggard in abating pollution." [12]  Both to provide the leadership to private industry and to abate violations of air pollution standards by federal facilities, in 1970 Congress added § 118 to the Clean Air Act.  The first sentence of the section provides:

"Each department, agency, and instrumentality of the executive, legislative, and judicial branches of

---

[8] Brief for Respondents 27.

[9] As amended, 81 Stat. 499, 42 U. S. C. § 1857f (a) (1964 ed., Supp. V).

[10] Congress first called on federal agencies to cooperate with efforts to reduce air pollution in 1959, Pub. L. 86–365, 73 Stat. 646.

[11] H. R. Rep. No. 91–1146, p. 4 (1970), 2 Legislative History of the Clean Air Amendments of 1970 (Comm. Print compiled for the Senate Committee on Public Works by the Library of Congress), p. 894 (1974) (hereafter Leg. Hist.).

[12] S. Rep. No. 91–1196, p. 37 (1970), 1 Leg. Hist. 437.

the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements." 42 U. S. C. § 1857f.

The remainder of § 118 authorizes the President, upon a determination that it is "in the paramount interest of the United States to do so" and subject to several limitations, to exempt certain federal emission sources from "compliance with such a requirement." [13]

After enactment of § 118 there is no longer any question whether federal installations must comply with established air pollution control and abatement measures. The question has become how their compliance is to be enforced.

## II

In February 1972, Kentucky submitted its implementation plan to the EPA. On May 31, 1972, the plan was approved by the Administrator in relevant part.[14] Chapter 7 of the plan included Kentucky Air Pollution Control Commission (Commission) Regulation No. AP–1, § 5 (1), which provides:

"No person shall construct, modify, use, operate, or maintain an air contaminant source or maintain

---

[13] The full text of § 118 appears at n. 41, *infra*.

[14] 37 Fed. Reg. 10842, 10868–10869 (1972). Approval of the plan was later vacated because the EPA had not given interested persons an opportunity to participate in its consideration of the plan. *Buckeye Power, Inc.* v. *EPA*, 481 F. 2d 162 (CA6 1973). After resubmission to the EPA and publication as a proposed rulemaking, 39 Fed. Reg. 10277 (1974), the plan was approved with an exception not pertinent here. *Id.*, at 29357.

or allow physical conditions to exist on property owned by or subject to the control of such person, resulting in the presence of air contaminants in the atmosphere, unless a permit therefor has been issued by the Commission and is currently in effect." [15]

An applicant for a permit must complete a form supplied by the Commission and, "when specifically requested by the Commission, include an analysis of the characteristics, properties, and volume of the air contaminants based upon source or stack samples of the air contaminants taken under normal operating conditions." [16] The process of review of the application may include hearings.[17] Permits are denied if the applicant does not supply the "information required or deemed necessary by the Commission to enable it to act upon the permit application," [18] or when "the air contaminant source will prevent or interfere with the attainment or maintenance of state or federal air quality standards." [19] When granted, a permit may be "subject to such terms and conditions set forth and embodied in the permit as the Commission shall deem necessary to insure compliance with its standards." [20] Once issued, a permit may be revoked or modified for failure to comply with the terms and conditions of the permit, with emission standards applicable to the air contaminant source, or with the

---

[15] Pet. for Cert. 46a. Although § 5 (1) does not explicitly apply to federal facilities, the definition of "person" in § 2 (32) of the Regulation includes any "government agency . . . or other entity whatsoever." App. in No. 73–2099 (CA6), p. 111 (hereafter CA App.). The applicability of § 5 (1) to federal facilities as a matter of Kentucky law has not been disputed.

[16] Reg. AP–1 §§ 5 (2) (a), (c), CA App. 120.

[17] See generally Reg. AP–10, CA App. 209–227.

[18] Reg. AP–1, § 5 (2) (c), CA App. 120.

[19] Id., § 5 (3) (a), CA App. 121.

[20] Id., § 5 (4), CA App. 121.

ambient air standards for the area in which the air contaminant source is located. Reg. AP–1, § 5 (5), CA App. 122.

Soon after the implementation plan was approved, a Commission official wrote to numerous officials responsible for various Kentucky facilities of the United States Army,[21] of the Tennessee Valley Authority (TVA),[22] and of the Atomic Energy Commission (AEC) [23] requesting that they apply for and obtain permits as requested by the EPA-approved plan. The responses to these requests were to the effect that federally owned or operated facilities located in Kentucky were not required to secure an operating permit. Each response, however, either offered to or did supply the information and data requested on the standard permit application form.[24]

The Commission continued to press the federal officials

---

[21] The Army facilities are the United States Army Armor Center and Fort Knox, Fort Campbell, and the Lexington and Blue Grass Activities, Lexington-Blue Grass Army Depot.

[22] Two TVA facilities are involved, the Shawnee and Paradise Power Plants.

[23] The AEC facility is the Paducah Gaseous Diffusion Plant for the production of enriched uranium, operated under contract by the Union Carbide Corp. Since the Commission initiated its efforts to secure a permit application from the AEC or its contractor, the Energy Research and Development Administration has succeeded to the AEC's responsibility for the Paducah plant. Pub. L. 93–438, 88 Stat. 1233; see 40 Fed. Reg. 3242, 3250 (1975).

[24] Fort Campbell officials, for example, after asserting that "current Department of the Army regulations do not allow us to apply for such a permit," submitted "pertinent information on our heating plants which appear to be covered by your regulations" and asked to be "advise[d] if any further information is desired." App. 48. TVA officials likewise disclaimed any duty to apply for a permit but submitted "the same emission data and other information for [TVA] power plants which your permit application forms are designed to elicit from applicants who are required to secure permits in order to continue their operations." For the Commission's con-

to apply for operating permits. In October 1972, the Regional Administrator of the EPA sent a letter to the operators of all federal facilities in the region, including those to which the Kentucky officials had addressed their requests, and to the Commission. Setting forth EPA policy and the agency's interpretation of § 118 of the Clean Air Act,[25] the Regional Administrator stated: "It is clear that Section 118 . . . requires Federal facilities to meet state air quality standards and emission limitations and to comply with deadlines established in the approved state air implementation plans." App. 57. To aid the States in accomplishing these objections, wrote the Administrator, each federal facility should develop a compliance schedule and should provide "reasonable and specific" data requested by the State. *Id.,* at 58. On the question whether federal facilities must apply for state permits, the letter reiterated the EPA position that although "Federal agencies are [not] required to apply for state operating permits . . . [o]ur aim is to encourage Federal agencies to provide the states with all the information required to assess compliance of pollution sources with standards, emission and discharge limitations and the needs for additional abatement measures."[26] *Ibid.*

venience, the TVA supplied the information on the Commission's own permit forms. *Id.,* at 52.

[25] In addition to § 118, the letter referred to Executive Order No. 11507, 3 CFR 889 (1966–1970 Comp.), which antedates the Amendments, as a policy source. This Order, cited in the complaint, has been superseded by Executive Order No. 11752, 3 CFR 380 (1974). See *infra,* at 199.

[26] The letter explained to the federal officials that the EPA's "advice on this matter, at this time, is to provide the data specifically requested by the states so they may make a determination as to: (1) the facilities compliance with the approved state air implementation plans and (2) the abatement action facilities must take in order to meet implementation plan requirements.

"We recommend that each Federal facility under your jurisdiction

Kentucky then brought this suit in the United States District Court for the Western District of Kentucky.[27] The complaint sought declaratory and injunctive relief requiring the Army, TVA, and AEC facilities to secure operating permits. Kentucky also named several EPA officials as defendants and asked the District Court to order them to commence appropriate actions under § 113 of the Clean Air Act, directing the Army, the TVA, and the AEC facilities to comply with the provisions of Regulation AP–1, § 5 (1).[28]    On cross-motions for summary

which has an air pollution discharge should initiate immediate discussion, if it has not already been accomplished, with the respective states, regarding development of a compliance schedule as required by their implementation plan. This compliance schedule should include the standards or emission limitations which must be met, the abatement equipment to be constructed, corrective measures to be taken, and the timetable for taking these actions in order to meet established implementation plan deadlines. Your agency will be obligated under the compliance schedule to conduct monitoring and to keep operating records. Whenever a state makes a reasonable and specific request to review operating records, we recommend that your agency adopt an open-door policy by providing the requested data." App. 57–58.

[27] The suit was brought by the Attorney General without the concurrence of the Commission. The District Court's ruling that Kentucky law permitted the Attorney General to sue without a request from the Commission is not challenged here.

[28] Section 113, as added, 84 Stat. 1686, 42 U. S. C. § 1857c–8, empowers the EPA Administrator, upon finding that any person is in violation of an applicable provision of an implementation plan or that violations of an applicable implementation plan are so widespread as to appear to result from ineffective state enforcement and upon giving notice, to commence appropriate action either by issuing an order to any person requiring compliance with the plan's requirements or by bringing a civil action under § 113 (b) in district court. The District Court and the Court of Appeals both ruled that, even if federal facilities were obligated to secure operating permits, the Administrator's duty to proceed under § 113 was discretionary. The decision not to commence actions

judgment, the District Court ordered the complaint dismissed. *Kentucky ex rel. Hancock* v. *Ruckelshaus,* 362 F. Supp. 360 (1973).

The Court of Appeals affirmed, 497 F. 2d 1172 (CA6 1974). Like the District Court, 362 F. Supp., at 363 n. 3, the Court of Appeals found it unnecessary to determine whether the federal installations were in compliance with Kentucky's emission limitations or had adopted adequate compliance schedules, for it was Kentucky's position that notwithstanding possible compliance "the Kentucky Plan is so formulated that the State cannot meet its primary responsibility under the Clean Air Act without the use of permits." 497 F. 2d, at 1174–1175. After examining § 118 and its purposes in relation to other provisions of the Clean Air Act, the court concluded:

> "We do not believe the congressional scheme for accomplishment of these purposes included subjection of federal agencies to state or local permit requirements. Congress did commit the United States to compliance with air quality and emission standards, and it is undisputed in this record that the federal facilities in Kentucky have cooperated with the Commission toward this end." 497 F. 2d, at 1177.

We granted Kentucky's petition for certiorari, 420 U. S. 971 (1975), to resolve a conflict in the Courts of Appeals,[29] and now affirm.

---

under § 113 was therefore unreviewable. 5 U. S. C. § 701 (a) (2); § 304 (a) (2) of the Clean Air Act, as added, 84 Stat. 1706, 42 U. S. C. § 1857h–2 (a) (2). Our disposition of the case makes it unnecessary to reach this alternative ground for judgment in favor of the EPA respondents.

[29] After the petition was filed, a divided panel of the Fifth Circuit concluded that § 118 does require federal facilities to secure a state operating permit and to comply with state "enforcement mecha-

## III

It is a seminal principle of our law "that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them." *M'Culloch* v. *Maryland,* 4 Wheat. 316, 426 (1819). From this principle is deduced the corollary that

> "[i]t is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Id.,* at 427.

The effect of this corollary, which derives from the Supremacy Clause [30] and is exemplified in the Plenary Powers Clause [31] giving Congress exclusive legislative authority over federal enclaves purchased with the consent of a State, is "that the activities of the Federal Government are free from regulation by any state." [32] As Mr. Justice Holmes put it in *Johnson* v. *Maryland,* 254 U. S. 51, 57 (1920):

> "[T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they

---

nisms." *Alabama* v. *Seeber,* 502 F. 2d 1238 (1974), cert. pending, No. 74–851. See also *California* v. *Stastny,* 382 F. Supp. 222 (CD Cal. 1972).

[30] Art. VI, cl. 2.

[31] Art. I, § 8, cl. 17:

"[The Congress shall have Power to] exercise exclusive Legislat[ive] . . . Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . ."

[32] *Mayo* v. *United States,* 319 U. S. 441, 445 (1943) (footnote omitted).

desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them . . . ."

Taken with the "old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign" [33] "without a clear expression or implication to that effect," [34] this immunity means that where "Congress does not affirmatively declare its instrumentalities or property subject to regulation," "the federal function must be left free" of regulation.[35] Particular deference should be accorded that "old and well-known rule" where, as here, the rights and privileges of the Federal Government at stake not only find their origin in the Constitution, but are to be divested in favor of and subjected to regulation by a subordinate sovereign. Because of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is "a clear congressional mandate," [36] "specific congressional action" [37] that makes this authorization of state regulation "clear and unambiguous." [38]

Neither the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the Federal Government. See *Penn Dairies*

---

[33] *United States* v. *United Mine Workers*, 330 U. S. 258, 272 (1947) (footnote omitted). See *United States* v. *Herron*, 20 Wall. 251, 263 (1874); *United States* v. *Knight*, 14 Pet. 301, 315 (1840).

[34] *United States* v. *Wittek*, 337 U. S. 346, 359 (1949) (footnote omitted).

[35] *Mayo* v. *United States, supra,* at 447, 448 (footnote omitted).

[36] *Kern-Limerick, Inc.* v. *Scurlock*, 347 U. S. 110, 122 (1954).

[37] *Paul* v. *United States*, 371 U. S. 245, 263 (1963).

[38] *California ex rel. State Water Resources Control Board* v. *EPA*, 511 F. 2d 963, 968 (CA9 1975), rev'd on other grounds, *post,* p. 200.

v. *Pennsylvania Milk Control Comm'n,* 318 U. S. 261 (1943); *Alabama* v. *King & Boozer,* 314 U. S. 1, 9 (1941), and cases cited. "Here, however, the State places a prohibition on the Federal Government." [39] The permit requirement is not intended simply to regulate the amount of pollutants which the federal installations may discharge. Without a permit, an air contaminant source is forbidden to operate even if it is in compliance with every other state measure respecting air pollution control and abatement. It is clear from the record that prohibiting operation of the air contaminant sources for which the State seeks to require permits, App. 14–17, is tantamount to prohibiting operation of the federal installations on which they are located. *Id.,* at 89–93.

Kentucky, like the Court of Appeals for the Fifth Circuit in *Alabama* v. *Seeber,* 502 F. 2d 1238, 1247–1248 (1974), finds in § 118 a sufficient congressional authorization to the States, not only to establish the amount of pollutants a federal installation may discharge, but also to condition operation of federal installations on securing a state permit. We disagree because we are not convinced that Congress intended to subject federal agencies to state permits. We are unable to find in § 118, on its face or in relation to the Clean Air Act as a whole, or to derive from the legislative history of the Amendments any clear and unambiguous declaration by the Congress that federal installations may not perform their activities unless a state official issues a permit. Nor can congressional intention to submit federal activity to state control be implied from the claim that under Kentucky's EPA-approved implementation plan it is only through the permit system that compliance schedules and other

---

[39] *California Pub. Util. Comm'n* v. *United States,* 355 U. S. 534, 544 (1958).

requirements may be administratively enforced against federal installations.

## IV

The parties rightly agree that § 118 obligates federal installations to conform to state air pollution standards or limitations and compliance schedules.[40] With the enactment of the Amendments in 1970 came the end of the era in which it was enough for federal facilities to volunteer their cooperation with federal and state officials. In Kentucky's view that era has been replaced by one in which federal installations are not only required to limit their air pollutant emissions to the same extent as their nonfederal neighbors, but also, subject only to case-by-case Presidential exemption, to submit themselves completely to the state regime by which the necessary information to promulgate emission limitations and compliance schedules is gathered and by which collection of that information and enforcement of the emission limitations and compliance schedules are accomplished. Respondents (hereafter sometimes EPA) take the position that the Congress has not gone so far. While federal and nonfederal installations are governed by the same emission standards, standards which the States have the primary responsibility to develop, the EPA maintains that the authority to compel federal installations to provide necessary information to the States and to conform to state standards necessary to carry out the federal policy to control and regulate air pollution has not been extended to the States.

---

[40] Title 40 CFR § 51.1 (p) (1975) defines "compliance schedule" as "the date or dates by which a source or category of sources is required to comply with specific emission limitations contained in an implementation plan and with any increments of progress toward such compliance." Basically a compliance schedule is a means by which a State phases in attainment with the ultimate emission limitations that must be achieved. See *Train,* 421 U. S., at 68–69.

Analysis must begin with § 118.[41] Although the language of this provision is notable for what it states in comparison with its predecessor,[42] it is also notable for what it does not state. It does not provide that federal installations "shall comply with *all* federal, state, interstate, and local requirements to the same extent as any other person." Nor does it state that federal installations "shall comply with *all* requirements of the applicable state implementation plan." Section 118 states only to what extent—the same as any person—federal installations must comply with applicable state requirements; it does not identify the applicable requirements. There is agreement that § 118 obligates existing federal installations to join nonfederal sources in abat-

---

[41] "Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements. The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so, except that no exemption may be granted from section 111, and an exemption from section 112 may be granted only in accordance with section 112 (c). No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption." 42 U. S. C. § 1857f.

[42] See 42 U. S. C. § 1857f (a) (1964 ed., Supp. V), *supra,* at 171.

ing air pollution, that comparable federal and nonfederal sources are expected to achieve the same levels of performance in abating air pollution, and that those levels of performance are set by the States. Given agreement that § 118 makes it the duty of federal facilities to comply with state-established air quality and emission standards, the question is, as the Fifth Circuit put it in another case, "whether Congress intended that the enforcement mechanisms of federally approved state implementation plans, in this case permit systems, would be" available to the States to enforce that duty. *Alabama v. Seeber,* 502 F. 2d, at 1247. In the case before us the Court of Appeals concluded that federal installations were obligated to comply with state substantive requirements, as opposed to state procedural requirements, 497 F. 2d, at 1177, but Kentucky rejects the distinction between procedural and substantive requirements, saying that whatever is required by a state implementation plan is a "requirement" under § 118.

The heart of the argument that the requirement that all air contaminant sources secure an operating permit is a "requirement respecting control and abatement of air pollution" is that Congress necessarily implied the power to enforce from the conceded authority to develop and set emission standards. Under Kentucky's EPA-approved implementation plan, the permit requirement "is the mechanism through which [it] is able to *compel* the production of data concerning air contaminant sources, including the ability to prescribe the monitoring techniques to be employed, and it is the only mechanism which allows [it] to develop and review a source's compliance schedule and *insure* that schedule is followed." [43] When a State is without administrative means of implementing and enforcing its standards

---

[43] Brief for Petitioner 21 (emphasis added).

against federal sources, a duty to comply with those standards is said to be utterly meaningless.[44]

The difficulty with this position is threefold. First, it assumes that only the States are empowered to enforce federal installations' compliance with the standards. Second, it assumes the Congress intended to grant the States such authority over the operation of federal installations. Third, it unduly disregards the substantial change in the responsibilities of federal air contaminant sources under § 118 in comparison with 42 U. S. C. § 1857f (a) (1964 ed., Supp. V), *supra*, at 171. Contrary to Kentucky's contention that Congress necessarily intended to subject federal facilities to the enforcement mechanisms of state implementation plans, our study of the Clean Air Act not only discloses no clear declaration or implication of congressional intention to submit federal installations to that degree of state regulation and control but also reveals significant indications that in preserving a State's "primary responsibility for assuring air quality within [its] entire geographic area" the Congress did not intend to extend that responsibility by subjecting federal installations to such authority.

The Clean Air Act, as amended, does not expressly provide for a permit system as part of a State's implementation plan.[45] It is true that virtually every State

---

[44] *Id.*, at 30. Several States which have filed briefs as *amici curiae* join Kentucky in recognizing that the issue is whether a State may enforce its emission limitations against a federal installation. See Brief for Alabama as *Amicus Curiae* 4, 5, 37–38; Brief for California as *Amicus Curiae* 9.

[45] Although use of a permit system may have been "encouraged" by the EPA as its "preferred approach," see *Train*, 421 U. S., at 68–69, the EPA has never made a permit system to control emissions from existing stationary sources a mandatory part of an implementation plan. The closest the EPA has come to this was a provision in a proposed rulemaking, 36 Fed. Reg. 6680, 6682 (1971), later eliminated, *id.*, at 15486, that might have been interpreted to

has adopted a form of permit system much like that adopted by Kentucky, see 40 CFR pt. 52 (1975), as a means of gathering information to determine what emission standards to set and compliance schedules to approve and of assuring compliance with them. Also, only an implementation plan enabling a State to meet these— and other—objectives can be approved by the EPA.[46] Nonetheless we find in the 1970 Amendments several firm indications that the Congress intended to treat emission standards and compliance schedules—those requirements which when met work the actual reduction of air pollut-. ant discharge—differently from administrative and en-

mean that an implementation plan must include a system requiring permits for the construction and operation of modifications to existing sources that would be modified before the Administrator promulgated proposed standards of performance for new sources under § 111 of the Clean Air Act. Compare 42 U. S. C. §§ 1857c–6 (a)(2), (b), with 36 Fed. Reg. 6682 (1971), proposing 42 CFR § 420.11 (a)(4).

[46] Among the eight conditions, §§ 110 (a)(2)(A)–(H), each implementation plan must meet are:

"(A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e)) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

"(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of . . . primary or secondary standard[s], including, but not limited to, land-use and transportation controls; [and]

"(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator . . . ."

forcement methods and devices—those provisions by which the States were to establish and enforce emission standards, compliance schedules, and the like. This is so in spite of the absence of any definition of the word "requirements" or of the phrase "requirements respecting control and abatement of air pollution." [47]

---

[47] The phrase "requirement respecting control or abatement of air pollution" also appears in § 116 of the Clean Air Act, as added, 84 Stat. 1689, 42 U. S. C. § 1857d–1. That section provides that, with certain exceptions pre-empting state regulation of moving sources,

"nothing in this Act shall preclude or deny the right of any State . . . to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants *or* (2) any *requirement respecting control or abatement of air pollution;* except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 111 or 112, such State . . . may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section." (Emphasis added.)

Although the meaning of the italicized phrase in this section, which was added by the Conference Committee, see H. R. Conf. Rep. No. 91–1783, p. 48 (1970), 1 Leg. Hist. 198, is not entirely clear, it seems plain that as employed in § 116 the phrase is not synonymous with "emission standards and limitations." As the Fifth Circuit observed in *Alabama* v. *Seeber,* 502 F. 2d, at 1245, the use of " 'or' in § 116 is clearly disjunctive." Yet it is agreed that, as used in § 118, the phrase does embrace such standards and limitations; indeed the EPA argues the two are synonymous.

It is suggested by an *amicus* that it is logical to read § 116 to mean that a " 'standard or limitation respecting emissions of air pollutants' is a subcategory of the broader class of 'requirement[s] respecting control or abatement of air pollution.' " Brief for Alabama as *Amicus Curiae* 20. To the contrary, from § 116 it appears more logical to conclude that "standards" and "requirements" are separate categories which, together, compose all measures which a State is not denied the right to adopt or enforce.

Unlike Kentucky and the Fifth Circuit, *Alabama* v. *Seeber, supra,* at 1245–1246, which conclude that use of the phrase in § 116 elucidates its scope and meaning in § 118, we are unable

In § 110 (e)(1)(A), for example, the EPA is authorized to extend for two years a State's three-year deadline for attaining a national primary air quality standard if, upon timely application, it is determined that an emission source is unable to meet "the requirements of such plan which implement such primary standard because the necessary technology" is unavailable. 42 U. S. C. § 1857c–5 (e)(1)(A). Although compiling the information necessary for a permit may require familiarity with technology, it is plain that the "requirements" to which this section refers are those for which technologically adequate industrial processes might not be available. Section 110 (e)(2)(A) necessarily contemplates the same meaning of "requirements," that is, emission standards and compliance schedules, as does § 110 (f) which provides for one-year postponement of the application of "requirements" to sources the continued operation of which is "essential to national security or to the public health." 42 U. S. C. § 1857c–5 (f)(1) (D). See *Train*, 421 U. S., at 80–84.[48]

Stronger indications that the term "requirements" as used in § 118 does not embrace every measure incorporated in a State's implementation limitations and com-

---

to draw from § 116 any support for the position that Congress affirmatively declared that federal installations must secure state permits. To reaffirm, as does § 116, a State's inherent right as a general matter to employ permits in the exercise of its police power in the area of air pollution control may mean that the Federal Government has not pre-empted the area from state regulation, but does not constitute the kind of clear and unambiguous authorization necessary to subject federal installations and activities to state enforcement.

[48] Provision in § 118 for Presidential exemption on a case-by-case basis and in the "paramount interest of the United States" from compliance with emission standards or compliance schedules does not clearly imply that federal installations are otherwise subject to the enforcement mechanisms of a state implementation plan.

pliance schedules appear in the emergence of § 118 from the House bill and Senate amendment from which it was derived.

The House bill provided that federal installations "shall comply with applicable Federal, State, interstate, and local *emission standards*." [49] The House Report stated that this "legislation directs Federal agencies in the executive, legislative, and judicial branches to comply with applicable Federal, State, interstate, and local *emission standards*." [50] The Senate amendment provided that federal agencies "shall provide leadership in carrying out the policy and purposes of this Act and shall comply with the *requirements* of this Act in the same manner as any person . . . ." [51] The Senate Report stated that this provision "requires that Federal facilities meet the *emission standards* necessary to achieve ambient air quality standards as well as those established in other sections of Title I." [52]

Thus while the House bill spoke of "emission standards," the Senate amendment, like § 118 as enacted, spoke of "requirements." In accommodating the different language in the two bills and formulating what is now § 118, the Conference Committee simply combined the House and Senate provisions. If, as Kentucky ar-

---

[49] H. R. 17255, 91st Cong., 2d Sess., § 10 (§ 111) (1970), 2 Leg. Hist. 938 (emphasis added).

[50] H. R. Rep. No. 91–1146, *supra*, n. 11, at 4, 2 Leg. Hist. 894 (emphasis added).

[51] S. 4358, 91st Cong., 2d Sess., § 7 (§ 118 (a)) (1970), 1 Leg. Hist. 573 (emphasis added).

[52] S. Rep. No. 91–1196, *supra*, n. 12, at 23, 1 Leg. Hist. 423 (emphasis added). Throughout the Senate amendment and in the Report the terms "requirements," "emission requirements," and "emission standards" were used interchangeably. Compare proposed § 118 (a) ("requirements") and the Report ("emission standards") with proposed § 111 (a)(2)(D) ("emission requirements"), 1 Leg. Hist. 545.

gues, the Conference Committee in taking the Senate language of "requirements" meant thereby to subject federal facilities to enforcement measures obviously not embraced in the language of the House bill, it is remarkable that it made no reference to its having reconciled this difference in favor of extending state regulation over federal installations. Given the interchangeable use of "emission standards" and "emission requirements" in the Senate amendment, see n. 52, *supra,* the predominance of the language of the Senate version in § 118 as enacted,[53] and the absence of any mention of disagreement between the two bills, it is more probable that the Conference Committee intended only that federal installations comply with emission standards and compliance schedules than that its intention was to empower a State to require federal installations to comply with every measure in its implementation plan. See *Alabama* v. *Seeber,* 502 F. 2d, at 1247.

The impression that Congress intended only that federal agencies comply with emission limitations and standards is strengthened by the Conference Report, which stated in full:

> "The House bill and the Senate amendment declared that Federal departments and agencies should comply with applicable standards of air quality and emissions.
>
> "The conference substitute modifies the House

---

[53] For example, only the Senate amendment equated the federal installation's duty to comply with "requirements" to any person's duty, a feature of § 118 as enacted. Similarly, only the Senate amendment, in § 118 (b) (1 Leg. Hist. 574), provided that a State might sue in federal court to enforce the provisions of § 118 (a). H. R. Conf. Rep. No. 91-1783, *supra,* at 55, 1 Leg. Hist. 205. That provision was incorporated in the Amendments in § 304 (a), through the definition of "person" retained in § 302 (e), as added, 77 Stat. 400, 42 U. S. C. § 1857h (e).

provision to require that the President rather than the Administrator be responsible for assuring compliance by Federal agencies." [54]

This examination of § 118 and the central phrase "requirements respecting control or abatement of air pollution," discloses a regime of divided responsibility for the mobilization of federal installations in the effort to abate air pollution. Kentucky agrees but persists in its contention that *existing* federal sources have been subjected to state regulation by differing on where that division places authority to enforce compliance by existing federal facilities—" 'sources with respect to which state implementation plans establish the criteria for enforcement.' " [55] For such—existing—sources, Kentucky maintains, the States are granted primary enforcement authority while " 'the responsibility and authority for

---

[54] H. R. Conf. Rep. 91–1783, *supra,* at 48, 1 Leg. Hist. 198. We are not persuaded by the argument that reference to the President's replacing the EPA Administrator as the one "responsible for assuring compliance by Federal agencies" only implicates the President's power to "exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with . . . a requirement." 42 U. S. C. § 1857f. Both the House and Senate Reports referred quite plainly to the power to exempt and to make exceptions when referring to the President's (or the Administrator's) power to act in the paramount interest of the United States on a case-by-case basis. S. Rep. No. 91–1196, *supra,* at 23, 1 Leg. Hist. 423; H. R. Rep. No. 91–1146, *supra,* at 15, 2 Leg. Hist. 905. Thus, reference in the Conference Report to the President's authority to assure compliance merely expresses what is implied by the very grant of authority to exempt some federal sources—the authority, as to those installations subject to Presidential control, to enforce in the first instance the new regimen of federal compliance with primarily state formulated and administered implementation plans rests in the Federal Government, not in the States.

[55] Brief for Petitioner 33, quoting *Alabama* v. *Seeber,* 502 F. 2d, at 1244.

enforcement . . . is granted to EPA in those instances (*i. e.,* new sources and hazardous pollutants) where EPA establishes the criteria.' " [56]   Perhaps we could agree if the issue were not whether there is a clear and unambiguous congressional authorization for the regulatory authority petitioner seeks, for as the Fifth Circuit has said, such a "scheme is a reasonable one." *Alabama* v. *Seeber, supra,* at 1244. But that is the issue, and the implications Kentucky draws from its evaluation of the manner in which the Congress divided responsibility for regulation of new sources and of hazardous air pollutants do not persuade us.

In drawing on the manner in which the Clean Air Act has divided the authority to regulate new sources of air pollutants [57] and the emission of hazardous air pollutants [58] in comparison with existing air pollutant sources, Kentucky makes two separate though related arguments. The first is that when Congress wanted to exempt federal facilities from compliance with a state requirement, it did so by express exclusionary language. Thus § 111 (c)(1) authorizes the Administrator to delegate to a State "any authority he has under this Act to implement and enforce" new-source standards of performance—with which new sources owned or operated by the United States must comply (§ 111 (b)(4))—"except with respect to new sources owned or operated by the United States." 42 U. S. C. § 1857c–6 (c)(1). Section 114 (b)(1) of the Clean Air Act, as added, 84 Stat. 1688, is to the same

---

[56] *Ibid.*

[57] Regulation of "new sources" of air pollutants, by EPA-promulgated "standards of performance" (see *infra,* n. 59), is provided for in § 111 of the Clean Air Act, as added, 84 Stat. 1683, 42 U. S. C. § 1857c–6.

[58] Regulation of "hazardous air pollutants" is provided for in § 112 of the Clean Air Act, as added, 84 Stat. 1685, 42 U. S. C. § 1857c–7.

effect respecting inspections, monitoring, and entry of an emission source. 42 U. S. C. § 1857c–9 (b)(1). Similarly, § 112 (d)(1) authorizes the Administrator, upon finding that a State's plan to enforce emission standards for hazardous pollutants is adequate to the task, to delegate to that State "any authority he has under this Act to implement and enforce such standards (except with respect to stationary sources owned or operated by the United States)." 42 U. S. C. § 1857c–7 (d)(1). The argument that these specific exemptions of federal facilities from state enforcement and implementation methods are necessary only because § 118 has, as a general matter, subjected federal installations to all state requirements fails on several counts. First, as we have demonstrated, by itself § 118 does not have the effect petitioner claims. Second, the relevant portions of §§ 111, 112, and 114 assume that the Administrator possesses the authority to enforce and implement the respective requirements against sources owned or operated by the United States. See §§ 111 (c)(2), 112 (d)(2), and 114 (b)(2). Third, just as in providing for Presidential exemptions in § 118 Congress separated the requirements of §§ 111 and 112 from other requirements, Congress naturally treated the submission of federal installations to state regulation under §§ 111, 112, and 114 separately from general provisions for meeting ambient air quality standards under § 110 implementation plans devised by the States and approved by the EPA. A State must promulgate an implementation plan. § 110 (a). The delegation provisions of §§ 111, 112, and 114, on the other hand, are permissive, providing that "[e]ach State *may* develop and submit to the Administrator a procedure" to carry out the section. (Emphasis added.)

Kentucky's second argument is that the manner in which Congress differentiated treatment of new sources

and existing sources in §§ 111 and 114 clearly implies that existing federal sources were to be subject to the enforcement provisions of a State's implementation plan. The implication is said to arise from the different nature of the control required for the two types of installations. The difference is explained as follows: For existing sources the first step for a State is to determine the general quality of air in the relevant air quality region and then to compute the amounts of pollution attributable to each source. Next, appropriate emission standards necessary to meet the national ambient air quality standards must be assigned to the various sources, followed by determining the compliance schedule by which each installation will achieve the assigned standards by the attainment date prescribed in the Act. To carry out this process of gathering information and coordinating control throughout the State, it is said to be necessary for the States to have ready administrative authority over all sources, federal and nonfederal. This administrative authority, concededly a major part of an implementation plan as to nonfederal sources, must therefore have been intended to extend to federal sources as well.

In contrast, controlling "new sources" is described as a straightforward task. This is because "standards of performance" for such sources, which are established in light of technologically feasible emission controls and not in relation to ambient air quality standards [59] are set by the EPA for various categories of sources and are uniform throughout the Nation. A comprehensive enforcement

---

[59] Section 111 (a) (1) defines a "standard of performance" to be "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated." 42 U. S. C. § 1857c–6 (a) (1).

mechanism to develop and coordinate application of these standards is unnecessary, especially because all new sources must be in compliance before operation begins, § 111 (e). The Congress is said, therefore, to have exempted new federal installations from state enforcement of federally promulgated standards of performance because it was unnecessary to submit those installations to the same kind of coordinated control to which existing sources had been submitted.

The Act itself belies this contention. It recognizes that a "new source," even one in full compliance with applicable standards of performance, may hinder or prevent attainment or maintenance of air quality standards within the air quality region in which it is located, and requires a state implementation plan to include procedures for averting such problems. See §§ 110 (a)(2) (D), (a)(4).

The arguments respecting the federal new-source exception in § 114 also fail to bear the weight they must carry if Kentucky is to prevail. Section 114 provides for the establishment of various means by which to collect information

> "[f]or the purpose (i) of developing or assisting in the development of any implementation plan under section 110 or 111 (d), any standard of performance under section 111, or any emission standard under section 112, [or] (ii) of determining whether any person is in violation of any such standard or any requirement of such a plan . . . ." 84 Stat. 1687, as added, 42 U. S. C. § 1857c–9 (a).

Unlike §§ 111 and 112, § 114 is doubly permissive. First, although the Administrator "shall" publish § 111 new-source standards of performance and § 112 hazardous air-pollutant-emission standards, under § 114 (a) the Administrator "may," but need not, require operators

of emission sources to keep records, to make reports, to install, use, and maintain monitoring equipment, and to sample its emissions. Second, as with §§ 111 and 112, the States "may" develop procedures to carry out the section. That Congress provided for this slight possibility that existing federal sources would be obliged to conform to state procedures for carrying out § 114 in addition to emission standards and compliance schedules scarcely implies, as petitioner suggests, that Congress intended existing federal sources to comply with *all* state regulatory measures, not only emission standards and compliance schedules. Rather than *exempting* new federal sources from an obligation to which they would otherwise have been subject, Congress may as well have been *extending* the obligation to conform to state § 114 regulatory procedures to existing—but not to new—federal sources which would not otherwise have been thought subject to such regulation.

Finally, we reject the argument that § 304 of the Clean Air Act, reveals congressional intention to grant the States authority to subject existing federal sources to the enforcement mechanisms of their enforcement plan. The section provides in part:

> "(a) Except as provided in subsection (b), any person may commence a civil action on his own behalf—
>
> "(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ." 42 U. S. C. § 1857h–2.

Section 302 (e) includes a "State" in the definition of a "person," 42 U. S. C. § 1857h (e), and § 304 (f) provides:

> "For purposes of this section, the term 'emission standard or limitation under this Act' means—(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard . . . which is in effect under this Act (including a requirement applicable by reason of section 118) or under an applicable implementation plan." 42 U. S. C. § 1857h–2 (f).

Although it is argued that § 304 was not intended to permit a State to sue violators under the Act, we agree with the EPA that § 304 is the only means provided by the Act for the States to remedy noncompliance by federal facilities with § 118. That § 304 was so intended is plain from both the language of § 304(f) and the legislative origins of § 304. The Senate version of § 118 provided that a State "in which any Federal property, facility, or activity is located may seek to enforce the provisions of this section pursuant to section 304 of this Act." [60] When the Conference Committee eliminated this subsection from the Senate amendment, it retained the definition of "person," which included a "State" in § 302 (e), and added § 304 (f) with the parenthetical phrase "including a requirement applicable by reason of section 118." This made clear that § 118 was to be enforced through § 304, and § 304 is the only provision in the Act for state enforcement of the duties of a federal installation under § 118. In short, § 118 establishes the duty of federal installations to comply with state "requirements," and § 304 provides the means of enforcing that duty in federal court. In light of this

---

[60] S: 4358, § 7 (§ 118 (b)), 1 Leg. Hist. 574. See n. 53, *supra*.

close relationship between the two sections, we find it significant that § 304 (f) extends the enforcement power only to "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," and not to all state implementation measures. Thus circumscribed, the scope of the § 304 power to enforce § 118 strongly suggests that § 118 duties themselves are similarly limited, for it seems most unlikely that in providing that a State might bring suit in district court to enforce the duties of federal installations under § 118, the Congress would not make all of those duties enforceable in district court. Yet this is exactly what Kentucky argues, saying: "There can be no explanation for the existence of Section 118 if it imposes no obligations other than those imposed under Section 304." [61]

The argument is defective on another count. Even if, standing alone, § 304 could be read to require federal facilities to comply with the matters within § 304 (f), the assumption that the two sections independently impose duties on federal installations conflicts with the legislative history. Section 304 (a) was first extended to apply to federal sources of pollution in Conference, at the same point at which the express provision for enforcement authority over federal installations was removed from § 118.[62] Given this relationship between

---

[61] Reply Brief for Petitioner 15–16.

[62] The House bill included no provision for suit in federal court. H. R. Conf. Rep. No. 91–1783, *supra*, at 55, 1 Leg. Hist. 205. The Senate amendment did provide for suit in district court "to require the enforcement of, the provisions of this Act including any applicable schedule or timetable of compliance, emission requirement, standard of performance, emission standard, or prohibition established pursuant to this Act . . . against any person, including, but not limited to, a governmental instrumentality or agency . . . ." S. 4358, § 9 (§ 304 (a) (1)), 1 Leg. Hist. 704. Because the

the two measures, we cannot credit the argument that § 118 was intended to impose on federal installations any broader duty to comply with state implementation measures than specified in § 304. The absence in § 304 of any express provision for enforcing state permit requirements in federal court is therefore too substantial an indication that congressional understanding was that the "requirements" federal facilities are obliged to meet under § 118 did not include permit requirements to be overcome by assertions to the contrary.

## V

In view of the undoubted congressional awareness of the requirement of clear language to bind the United States,[63] our conclusion is that with respect to subjecting federal installations to state permit requirements, the Clean Air Act does not satisfy the traditional requirement that such intention be evinced with satisfactory clarity. Should this nevertheless be the desire of Congress, it need only amend the Act to make its intention manifest.[64] Absent such amendment, we can only conclude that to the extent it considered the matter in enacting § 118 Congress has fashioned a compromise which, while requiring federal installations to abate their pollution to the same extent as any other air contaminant source and under standards which the States have pre-

---

Senate amendment retained previously enacted § 302 (e) of the Clean Air Act, see n. 53, *supra*, defining "person" as "an individual, corporation, partnership, association, State, municipality, and political subdivision of a State," it is clear, as the Senate Report confirms, that in the Senate amendment it was only by virtue of § 118 that a State could sue a federal facility for enforcement in district court under § 304. S. Rep. No. 91–1196, *supra*, at 37, 1 Leg. Hist. 437.

[63] See *United States* v. *United Mine Workers*, 330 U. S., at 273.

[64] The Senate Committee on Public Works has recently reported such legislation. See S. Rep. No. 94–717 (1976).

scribed, stopped short of subjecting federal installations to state control.

This conclusion does not mean that we are persuaded that the States are as able to administer their implementation plans as they would be if they possessed the degree of authority over federal installations urged here, although, as Kentucky acknowledged at oral argument, the EPA, acting under the impetus of Executive Order No. 11752, 3 CFR 380 (1974), has promulgated guidelines for compliance by federal agencies with stationary source air pollution standards, 40 Fed. Reg. 20664 (1975), which will lead to federal agencies' entering "consent agreements which are exactly identical in every respect to what a compliance schedule would have been." [65]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST dissent. They agree substantially with the reasoning of the Court of Appeals for the Fifth Circuit in *Alabama* v. *Seeber,* 502 F. 2d 1238, and they would reverse the judgment before us on the grounds set out in that opinion.

---

[65] Tr. of Oral Arg. 22.