**PEOPLE OF the STATE OF CALIFOR-NIA, etc., Plaintiffs-Appellees,**

v.

**DEPARTMENT OF THE NAVY et al., Defendants-Appellants.**

No. 79–4304.

United States Court of Appeals, Ninth Circuit.

June 2, 1980.

Rehearing Denied Aug. 22, 1980.

* The Honorable Philip C. Wilkins, Chief United States District Judge for the Eastern District of California, sitting by designation.

Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., Anne S. Almy, Asst. U.S. Atty., Dept. of Justice, Washington, D. C., argued for defendants-appellants; G. William Hunter, Asst. U.S. Atty., San Francisco, Cal., on brief.

Rod Walston, Deputy Atty. Gen., San Francisco, Cal., Richard W. Grieves, San Francisco, Cal., for plaintiffs-appellees.

Before TANG and FERGUSON, Circuit Judges, and CURTIS,* District Judge.

TANG, Circuit Judge:

The State of California brought this action against the U. S. Navy, claiming that the level of air pollution from certain of the Navy's jet engine test cells violates California air quality standards promulgated under the Federal Clean Air Act. The district court, in its judgment filed February 10, 1979, based on its orders of February 10, 1979 and April 12, 1977 (the latter reported at 431 F.Supp. 1271 (N.D.Cal.1977)), granted California's claim for equitable relief and ordered the Navy to meet California's emission standards. The Navy appeals and argues that federal preemption of state regulation of aircraft or engine emissions includes and exempts emissions from engine test cells also. We affirm the district court's judgment.

## I. FACTS AND STATUTORY BACKGROUND

The Navy conducts jet engine tests and maintenance at several naval bases in California. These operations include testing detached jet engines in immobile concrete housing structures called "test cells".[1] The

---

* Honorable Jesse W. Curtis, United States Senior District Judge for the District of Central California, sitting by designation.

1. In addition to immobile test cells, the military also has demountable or movable metal test

cells hold the engine in place while it is run and provide locations to put the testing equipment. A typical cell is a concrete tube in the shape of a wide or elongated U, 85 feet along its horizontal side, with open vertical towers 60 feet high at each end, for an air inlet and an exhaust outlet. Sometimes a water spray is used to cool the gases. Except for this water vapor and raw intake air, all emissions from a test cell are produced solely by the jet engine being tested. At various times, the emissions from these test cells, depending on the engine being tested, violate the air pollution standards of the local California authorities promulgated under the Clean Air Act.

Under the Federal Clean Air Act, 42 U.S.C. § 7401 et seq. (formerly codified at 42 U.S.C. § 1857 et seq.), the Administrator of the Environmental Protection Agency has the responsibility for promulgating standards for ambient air quality. Section 109, 42 U.S.C. § 7409. But the states have primary responsibility for implementing those standards; the states must develop and adopt "implementation plans" which, after EPA approval, are published as regulations in the Federal Register. Section 110, 42 U.S.C. § 7410. Federal installations are required to comply with state implementation standards. Section 118, 42 U.S.C. § 7418; *Hancock v. Train*, 426 U.S. 167, 182–83, 96 S.Ct. 2006, 2014, 48 L.Ed.2d 555 (1976).[2] The state implementation plans may contain pollution requirements which are more, but not less, strict than the EPA standards. California has gone through all the required steps, including EPA approval, in adopting and enforcing its implementation plan with its pollution requirements.[3]

cells and open-air test stands for out-of-airframe jet engine testing. The impact of this case on emissions from these test devices was not addressed below, but the rationale of the preemption test used by the district court could be applied. We make no implication as to whether state regulation of such other testing could pass the preemption test. The fixed test cell is likely to be the more bothersome polluter because it is in one location and is used regularly as the Navy brings jets to facilities with fixed cells for extended testing and maintenance.

While the states have broad power to implement standards under 42 U.S.C. § 7410, the Clean Air Act preempts certain state regulation of certain moving sources of pollution: new motor vehicles (42 U.S.C. § 7543), motor vehicle fuels and additives (42 U.S.C. § 7545), and aircraft and aircraft engines (42 U.S.C. § 7573). This suit involves the last provision: Clean Air Act § 233, 42 U.S.C. § 7573, which reads in full:

> No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part.

## II. ISSUE ON APPEAL

Are jet engine test cells within the intended scope of § 233 of the Clean Air Act so that state regulation of pollution from them is preempted or are these test cells within the usual statutory framework of the Clean Air Act so that state regulation is authorized?

## III. DISCUSSION

### A.

The parties agree that under § 233, Congress preempted to, or retained under, federal control the regulation of pollution from aircraft and aircraft engines. This appeal resolves into a single question of statutory construction: Are the immobile test cells involved here within the intended scope of § 233 preemption?

2. Under 42 U.S.C. § 7418(b), a presidential exemption from implementation standards is available for federal installations when it is in the paramount national interest. The Navy has not sought such an exemption here.

3. Private, commercial test cells users (airline companies and manufacturers of engines or aircraft) are also subject to the state and local pollution requirements.

The district court below discussed the preemption doctrine extensively and excellently, with emphasis on applying it in this context. *See* 431 F.Supp. at 1281–90. We shall not repeat that discussion here. In applying the preemption doctrine to § 233, the district court developed a test for § 233 preemption with which we are in general agreement.

■ Examining the text and apparent purpose[4] of § 233, the district court concluded that § 233 is concerned with direct state regulation of aircraft or aircraft engines or with other state regulation which would affect the aircraft or engine. This was the intended scope of § 233. It was not intended to be preclusive of all state regulation of the field of aircraft engines. We agree. The district court then established the fundamental rationale of its preemption test, namely, if the state pollution regulations can be met without affecting the design, structure, operation, or performance of the aircraft engine, then the state emission regulations are not preempted by § 233.[5] We agree with this underlying preemption principle, finding it completely in accord with the scope of § 233.

## B.

■ Turning to the facts of the particular state regulations involved here as applied to testing within the fixed test cells in question, the district court found that feasible means exist whereby emissions from these test cells can be regulated without having the prohibited effect on the engines themselves.[6] Then, since the conditions of its preemption test were met, the district court held that state regulation of engine emissions from these test cells was not preempted. We agree with the district court.

4. There is little legislative history on the scope of § 233, 42 U.S.C. § 7573. However, it shows congressional concern with preventing states from imposing emissions standards as a condition precedent in the sale, titling, or registration of aircraft or engines. H.Rep.No.91–1146, 91st Cong., 2d Sess., *reprinted in* [1970] *U.S. Code Cong. & Admin.News*, pp. 5356, 5370. This concern is met, under the district court's ruling.

5. *See* 431 F.Supp. 1271, 1281 (top of second column), 1283 (second column, text accompanying footnote 11), 1285 (second column at headnote 20), 1287 (first column at first full paragraph), & 1287 (second column at end of carryover paragraph).

Besides the obvious alterations in or additions to the engine, this condition also includes impairment of the effectiveness and accuracy of the tests conducted. Such impairment relates to performance and may threaten the federal safety interest, thus implicating § 233.

6. This finding pervades the district court's discussion in 431 F.Supp. 1271, 1281–90. The two most specific instances follow.

Furthermore, it appears uncontroverted that such regulation is both feasible and effective—there are apparently numerous ways to modify test cell smoke stacks so that emissions introduced into the atmosphere from them can be reduced to reasonable levels in compliance with state implementation standards. In fact, it seems that defendants have studied or experimented with several such methods, including nucleation scrubbers, electrostatic precipitators, and so-called dry systems, all of which involve structural alteration of or addition to the test cell without any effect on the aircraft engine itself.

431 F.Supp. at 1281 n.7.

Defendants have expended and are continuing to expend substantial time, energy and money to identify and evaluate methods for reducing visible emissions resulting from military engines being tested in test cells. Defendants have identified several ways in which a test cell may be modified so as to result in reduced visible emissions from the test cell stack. Such ways include use of wet packed cross-flow scrubbers and dry augmentors. The Department now has scrubbers in use test cells at the Naval Air Research Facility, Jacksonville, Florida, and the Naval Air Research Facility, Norfolk, Virginia. These test cells are now being used on a limited basis pending full acceptance by the Department. The Department has also researched ways in which to reduce the visible exhaust of jet engines by a modification of the engine combustion chamber or by a use of additives in the fuel. The modified J79010A engine is designated the J79–10B and its operation in test cells has not been shown to cause excessive visible emissions. The use of fuel additives which act as combustion catalysts may effect a more thorough combustion of particulates and may thereby reduce visible emissions.

Finding of Fact No. 24 in the Supplemental Order of February 10, 1979.

The test cells here are substantial concrete structures. Even though the pollution comes from a jet engine, if the pollution can be abated before it leaves the test cell by means which do not require modification of the engine, then there is no reason why state regulation may not apply. The purposes of federal preemption in this area— namely, aviation safety and uniformity of standards—are preserved where it matters: engine regulation. State regulation, insofar as it is allowed under the test developed by the district court, will not impair the federal interests because those interests would be impaired only if the aircraft or engine must be altered to accommodate state law.[7] That would not occur under the test which the district court used for preemption here.

### C.

The decision below was by summary judgment. The findings of the district court include a finding that means exist whereby test cell emissions can be controlled without affecting the engine. The Navy does not raise as an issue on appeal that there were disputed issues of material fact. The Navy's argument is a purely legal one that the scope of § 233 preemption is broader. Thus, the Navy is in no position to challenge the factual application of the district court's preemption test.

This is especially so for two additional reasons. First, prior to the April 12, 1977 ruling, the Navy declined, despite requests from the district judge, to present arguments and evidence as to potential federal interests which might be impaired by test cell modification. *See* 431 F.Supp. at 1289. Second, between the 1977 opinion which set forth the district court's preemption test and the summary judgment in 1979, the Navy, knowing what facts were important under the district court's test, had nearly two years to present evidence raising material factual dispute but did not.

If the Navy has new evidence raising dispute over the factual bases of the district court's judgment, its proper course is not to bring this before an appellate court, but to seek relief in the district court under F.R. Civ.P. 60(b). No special circumstances are present here warranting an exception to the usual procedure. The Navy also has other remedies. For example, it may seek presidential exemption under 42 U.S.C. § 7418(b), or it may seek congressional amendment of § 233.

### IV. CONCLUSION

Agreeing with the preemption test of the district court, we hold that emissions from aircraft engine test cells are subject to state pollution regulations if those regulations can be met without affecting the engine. If the state regulations cannot be met without effect upon the engine, then they become a regulation of the engine itself and are preempted under § 233. The test developed by the district court and adopted here will call for case-by-case determinations, depending on the pollution standard set by the particular state regulation involved and on the then-existing feasible technical means of controlling emissions without an effect on the engine. Such a case-by-case approach is an appropriate means to accommodate the dual congressional purposes of allowing broad state sovereignty in air pollution regulation and of protecting certain paramount federal aviation interests.

The district court is AFFIRMED.

---

7. *See* note 5 and accompanying text *supra*.